**Revised August 8, 2000**

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 98-40877

_____

JILL BROWN,

Plaintiff-Appellee-Cross-Appellant,

versus

BRYAN COUNTY, OK; ET AL.,

Defendants,

BRYAN COUNTY, OK,

Defendant-Appellant-Cross-Appellee,

STACY BURNS,

Defendant-Cross-Appellee.

_____

Appeals from the United States District Court for the
Eastern District of Texas, Sherman

_____

July 18, 2000

Before REYNALDO G. GARZA, JOLLY, and DeMOSS, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

This appeal presents a case brought under 42 U.S.C. § 1983 for injuries resulting from excessive force by an arresting officer, for which Bryan County, Oklahoma, was found liable by a jury on the basis of its failure to provide any training to a reserve deputy who was allowed to make arrests. Stacy Burns, a young,

inexperienced reserve sheriff's deputy, without the benefit of training or supervision, participated in a car chase and arrest involving the use of force. Because of the manner in which Burns effectuated the arrest, the plaintiff, Jill Brown, suffered severe knee injuries. The question is whether Bryan County can be held liable under Monell v. New York City Dept. of Social Servs., 436 U.S. 658 (1978), for her injuries because the County failed to train Burns.

We conclude that the evidence, given the standard of review of a jury verdict, fairly allowed the jury reasonably to conclude that Bryan County's sheriff, admittedly a policymaker, failed to train Burns in the light of facts demonstrating an obvious need to train him. We think the jury reasonably concluded that, given notice of the need to train Burns and that the consequences of the failure to train him were so obvious, that the County is culpable for its failure to train him. Furthermore, the evidence allowed a reasonable inference that the decision not to train Burns was the "moving force" behind, i.e., directly caused, the injuries suffered by Brown. Given these conclusions, we hold that Brown established that Sheriff Moore's decision not to train Burns constituted a policy decision for which the County is liable under § 1983.

The case has a significant procedural history. We have issued two previous opinions, see Brown v. Bryan County, Oklahoma, 53 F.3d 1410 (5th Cir. 1995), withdrawn and superseded by, 67 F.3d 1174 (5th Cir. 1995), and the Supreme Court has considered the case.

2

See Bd. of the County Comm'ns of Bryan County v. Brown, 520 U.S. 387 (1997).  When the Supreme Court reversed our decision upholding liability against the County on the basis of its hiring decision,[1] we remanded to the district court for further consideration. Specifically, the district court had to decide whether liability against the County could be upheld on the basis of the jury's finding that the County had a policy of not training its officers. 117 F.3d 239, 240 (5th Cir. 1997).  On remand, the district court denied the County's motion for judgment as a matter of law and upheld the earlier jury verdict in favor of the plaintiff.  The County appeals the district court's denial of its j.n.o.v. motion. In a cross-appeal to this second judgment, Brown complains that the district court struck all compensatory damages for lost income and lost earning capacity, and reduced to a nominal award damages awarded for her abstract injuries from the violation of her constitutional rights.

We affirm the judgment as it relates to the County's liability under 42 U.S.C. § 1983.  We also affirm the district court's judgment with respect to damages.

---

[1]With this vacatur, our previous opinion is no longer the law of the case.  See Johnson v. Chicago Bd. of Educ., 457 U.S. 52, 53–54 (1982) ("Because we have vacated the Court of Appeals' judgments in this case, the doctrine of the law of the case does not constrain either the District Court or, should an appeal subsequently be taken, the Court of Appeals."); O'Connor v. Donaldson, 422 U.S. 563, 577 n.12 (1975) ("Of necessity, our decision vacating the judgment of the Court of Appeals deprives that court's opinion of precedential effect, leaving this Court's opinion and judgment as the sole law of the case.").

The jury awarded Jill Brown extensive damages on her 42 U.S.C. § 1983 claim against the County for injuries she sustained because of the excessive force used by the arresting officer, Reserve Deputy Burns. The jury found that Bryan County policymaker, Sheriff B. J. Moore, failed to train Burns in the proper use of force.[2] The jury specifically found that "the training policy of Bryan County . . . was so inadequate as to amount to deliberate indifference to the constitutional needs of the plaintiff." Brown argues that this failure-to-train policy was the "moving force" behind her injury. This much is undisputed: Sheriff Moore is a final policymaker for Bryan County and Burns used excessive force against Brown in violation of her Fourth Amendment rights to be free from unreasonable seizures. The question is whether the County can be held liable for these injuries under § 1983.

II

The underlying events occurred in the early morning hours of May 12, 1991. Todd Brown was driving a pickup truck from Texas into Oklahoma, with his wife as a passenger, when he saw a roadblock ahead. He decided, for reasons the jury could have accepted as plausible, to turn around. The execution of the 180 degree turn and the speed of the pursuit that followed were hotly

---

[2]The jury also reached similar conclusions about the County's decision to hire Burns. The jury's conclusions with respect to Brown's failure-to-train claim were separate and apart from the hiring conclusions.

disputed before the jury.  Jill Brown claims to have been asleep through most of this event.  The County deputies eventually stopped the Browns' truck on an unlighted country road.

The events leading to Jill Brown's injuries were also disputed.  As we must, we accept the version of the facts most favorable to upholding the verdict.  Indeed, it is not contested that Burns's application of excessive force resulted in a constitutional injury in violation of Brown's Fourth Amendment rights.  Burns removed Brown from the truck using, what he claimed, an "arm bar" technique.  Brown testified that Burns used force despite her best efforts to comply with Burns's command to her to exit the truck.  Burns says that he needed to use this technique because she was unresponsive to commands to get out of the vehicle.[3]  According to Burns, Brown was bending forward in her seat after Burns opened the truck door.  Burns interpreted this as a threatening gesture, that is, she may have been reaching for a gun.  Burns, however, admits that Brown did not struggle, did not strike out, and did not even say anything to him during the course of the event.  In the process of removing Brown, Burns grabbed her,

---

[3]The jury had reason to question Burns's credibility.  On the stand, Burns admitted lying in his deposition and to changing his deposition answer only when threatened with a perjury charge. Burns then proved less than forthcoming in his trial testimony, omitting facts of his arrest record until pressured during cross-examination.  Thus, the jury may have been skeptical of his other testimony on critical issues, especially those facts going to any training he might have received, or, for instance, his claim that he took the Minnesota Multiphasic Personality Inventory test.

pulled her from the truck, and spun her to the ground. She landed on the pavement knees first. Either during or immediately after application of the "arm bar" technique, Burns had at least one knee in Brown's back. As a result of the incident, Brown suffered severe knee injuries.

It is important to note some pertinent background facts relating to Burns. At the time of the incident, Burns was only twenty-one years old. He was also inexperienced. He had been on the force for a matter of weeks. He had no experience as a law enforcement officer before beginning work as a reserve deputy for the County. His educational background consisted of a high school diploma and a few semesters of college. Although purporting to have majored in criminal justice, Burns testified that he had not taken any law enforcement courses. His work experience consisted of general delivery and sales--"kind of a 'go-fer'"--for two furniture companies.

His record of having engaged in some inappropriate conduct before joining the force is undisputed. Within the two-year period before his hire, Burns had been arrested for assault and battery, resisting arrest, public drunkenness, driving while intoxicated, possession of false identification, driving with a suspended license, and nine moving traffic violations.[4] At the time he was hired, Burns was in violation of the terms of his

---

[4]The more serious of these offenses all arose from one incident involving a fracas while a college student.

probation; for that reason, he had an outstanding warrant for his arrest.[5]

Finally, his conduct for the short time that he had been on the force also suggested a problem. Specifically, the jury reasonably could have concluded that he had an excessive number of "takedown" arrests, similar to the one in which Jill Brown was injured.

We also note several relevant background facts with respect to operation of the sheriff's department. Here, the evidence, viewed in the light most favorable to the jury's verdict, showed the County to have a policy of providing no training itself for its regular officers and reserve deputies. The record indicates that the County's practice was to hire individuals for full-time positions who had already received training from Oklahoma's Commission on Law Enforcement Education and Training ("CLEET") program.[6] With respect to reserve deputies of Bryan County, the

---

[5]The evidence here buttresses testimony by the County's expert that Sheriff Moore disregarded the statutory requirements for hiring of a new officer, such as the mandate that a new hire be subjected to a personality test, undergo fingerprinting so that the FBI and OSBI can perform background checks, and that a form be submitted to CLEET on the date of hire so that the twelve-month training clock starts to run.

[6]The CLEET program trains officers and potential officers in all aspects of law enforcement, including patrol tactics, the use of force, public safety, and the like. Students in CLEET are specifically trained in the use of "auto extraction techniques," such as the arm bar technique allegedly employed by Burns. Our opinion should not be construed to reflect a finding that training through CLEET is somehow inadequate. The parties appear to agree that CLEET training is mandatory for all Oklahoma police officers,

record is not entirely clear whether CLEET is mandatory. The County also made available television training programs through the Law Enforcement Training Network ("LETN")(although Sheriff Moore testified that there is no requirement that the programming actually be watched), and there remained the possibility that an officer could receive *ad hoc* on-the-job training.

Sheriff Moore acknowledged that the County itself does not train its officers. Confirming this admission, Sheriff Moore further testified that there were no funds to train personnel.[7] Both the plaintiff's expert and the defendants' expert corroborated this lack of training, and it was stressed to the jury during the plaintiff's closing argument. Further substantiating Sheriff Moore's testimony about the absence of County-provided training, Officer Morrison, Burns's partner during the incident, testified that, although he completed CLEET training before joining the County's force (through working in another county), he had received no training from the County.

_____

full-time or reserve. See, e.g., Okla. Stat. Ann. tit. 70 § 3311(D)(2).

[7]We are sympathetic to the budget problems of local governments, especially rural counties. The plaintiff's expert, however, outlined a range of no-cost training options. The County's expert testified that CLEET provides training material for local police forces at no cost, will work with local police agencies to develop a training program without charge, and holds free regional training sessions across the State of Oklahoma. According to the evidence, Sheriff Moore elected not to pursue any of these options.

8

The County's handling of Burns also reflects its lack of a training program.  At his deposition, Burns testified that he had received no training through Bryan County.  Specifically, he testified that he received "no formal training."  He did not even receive any "written documentation from Bryan County as to [his] duties as a reserve officer."

Burns did testify, however, that he received several months of training at CLEET, had gone on "ride-alongs" with his grandfather (a special deputy) and another officer, and watched police training videos via the LETN network.  The jury, however, reasonably could have rejected these claims.  Particularly noteworthy is the strong evidence, which the jury could reasonably have believed, showing that Burns never attended CLEET.  First, he could not remember any dates on which he would have attended this program.  The evidence showed that he did not apply for CLEET training until May 6, 1991, only six days before the Brown incident although he had been serving as a reserve deputy for four or five weeks.  Given that CLEET classes are held only three days per week, he could not have attended more than three classes.  Other evidence shows, however, that he attended <u>no</u> classes before the Brown incident.  Burns's Employment Status Sheet, which must be filed with CLEET within ten days of hire, is dated June 12, 1991, thirty days <u>after</u> the Brown incident, or in excess of two months after his hire.  Another form that had to be completed before Burns could be accepted into the CLEET program was dated May 30, 1991, eighteen days after the Brown

incident. With respect to the "ride-alongs" and LETN, the jury could have discredited, or at least minimized, Burns's claims in the light of his often contradicted testimony. Although there is some evidence that Special Deputy Joe Calclazier, his grandfather, provided some *ad hoc* training to Burns, the record suggests that this training was minimal at best and included no training on arrest situations.[8]

Closely connected to its practice of providing no training, the evidence reasonably supported a conclusion that the County also failed to provide formal, and very little effective, supervision for its reserve deputies who were "on the street." Moore acknowledged that he gave no explicit instructions to any deputy about his responsibilities to supervise a reserve deputy. The officer accompanying Burns during the incident testified that he received none. The County's own expert testified that such supervision of an "inexperienced, untrained" officer is required. The County's expert also testified that a reasonable police chief would have provided these guidelines to his regular deputies and to reserve deputies.

---

[8]Special Deputy Calclazier testified that he "tried to impart what knowledge [he] had in law enforcement including "ideas" on "[p]ositions, where you stopped automobiles, custody and control. In other words, to watch people, if when you have them stopped to be sure one of them couldn't hurt you. There's – there's ways that you watch, keep an eye on things." That is the entirety of his statement.

We review *de novo* the district court's ruling on a motion for judgment as a matter of law.  See <u>Travis v. Bd. of Regents of Univ. of Texas</u>, 122 F.3d 259, 263 (5th Cir. 1997).  A motion for judgment as a matter of law will be granted only if

> the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict. . . . On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied . . . .

<u>Boeing v. Shipman</u>, 411 F.2d 365, 374 (5th Cir. 1969) (en banc), *overruled on other grounds*, <u>Gautreaux v. Scurlock Marine, Inc.</u>, 107 F.3d 331 (5th Cir. 1997) (en banc).  "A motion for judgment as a matter of law . . . in an action tried by jury is a challenge to the legal sufficiency of the evidence supporting the jury's verdict."  <u>Harrington v. Harris</u>, 118 F.3d 359, 367 (5th Cir. 1997).  We consider all of the evidence, drawing all reasonable inferences and resolving all credibility determinations in the light most favorable to the non-moving party.  See <u>Rhodes v. Guiberson Oil Tools</u>, 75 F.3d 989, 993 (5th Cir. 1996).  Although we review denial of a motion for judgment as a matter of law, we note that our standard of review with respect to a jury verdict is especially deferential.  See, e.g., <u>Snyder v. Trepagnier</u>, 142 F.2d 791, 795 (5th Cir. 1998)("We may overturn a jury verdict only if it is not supported by substantial evidence, meaning 'evidence of such

quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions.' We accord all reasonable inferences to the nonmovant, and we reverse only if no reasonable jury would have arrived at the verdict.").

IV

It is clear that a municipality's policy of failing to train its police officers can give rise to § 1983 liability. "[T]he failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." City of Canton v. Harris, 489 U.S. 378, 390 (1989) The difficult legal question, however, is whether here the County may be liable for the decision of Sheriff Moore, a policymaker, not to train Burns.

Here, the parties have stipulated to constitutional injury and the existence of a policymaker. Therefore, to establish whether the district court correctly judged § 1983 liability appropriately here, we look for the remaining elements to establish the County's liability in this case: (1) a decision by a decisionmaker that amounts to a policy under Monell and its progeny; (2) a decision so deliberately indifferent to the rights of the citizens that the County fairly can be said to be culpable for the injury; and (3) sufficient causation between the specific policy decision and the resulting constitutional injury.

12

An official policy, for purposes of § 1983 liability, is "[a] policy statement, ordinance, regulation or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority." Bennett v. City of Slidell, 735 F.2d 861, 862 (5th Cir. 1984) (en banc). Alternatively, official policy is "[a] persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy" Id. Finally, "a final decisionmaker's adoption of a course of action 'tailored to a particular situation and not intended to control decisions in later situations' may, in some circumstances, give rise to municipal liability under § 1983.") Bryan County, 520 U.S. at 406 (quoting Pembaur v. Cincinnati, 465 U.S. at 481).[9] The culpability element, which may overlap with proof of a policy, requires evidence that "the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice." Brown, 520 U.S. at 407 (citation omitted). "'Deliberate indifference' is a stringent standard, requiring proof that a municipal actor

---

[9]That the legal meaning of the term "policy" encompasses a range of municipal behavior can be found in Monell. "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible." 436 U.S. at 694 (emphasis added).

13

disregarded a known or obvious consequence of his action." Id. at 410. The causation element demands that the plaintiff show that the objectionable municipal policy was the "moving force" behind the plaintiff's injury. Id. at 408. See also City of Canton, 489 U.S. at 388 (1989) (same).

A

1

Based on the way the parties present and argue this case on appeal, we focus on whether the failure to provide Burns training as an individual, and not whether the County had a policy of not training its deputies generally.[10] We ask whether there was a decision by a policymaker that can satisfy the first element of ultimately imposing Monell liability. In other words, if Monell liability is to be imposed, it must be done on the grounds of the single decision by Sheriff Moore to require no training of Burns before placing him on the street to make arrests.

Given our standard of review, we think that the jury could have found that the failure to train Burns was a decision that amounted to a County "policy." First, Sheriff Moore was a policy maker who either could require training for Burns or not. Furthermore, Moore's awareness of Burns's youth, inexperience,

---

[10]Although the County had no formal policy of training for its deputies or reserve officers, the record indicates that Bryan County hired trained and experienced deputies. With respect to reserve officers of Bryan County, the record addresses no failure-to-train situations other than Burns's.

14

personal background, and ongoing arrest activities while with the department, along with the highly predictable risk of injury from the improper use of force by an untrained officer, provided sufficient notice to Moore of the need to train Burns so as to make his failure to require training a conscious decision.

Our conclusion in this respect stems from the following evidence. First, the jury reasonably could have attached some significance to the fact that Burns was kin to Sheriff Moore. This relationship, along with the fact that the sheriff's department had relatively few officers, makes it highly unlikely that Burns was "lost in the crowd," and his training simply neglected. Second, the jury could have reasonably concluded that Moore knew of Burns's immature background. This is a point on which all courts, including the Supreme Court, have overwhelmingly agreed. See Bryan County, 520 U.S. at 414 (majority opinion) and 427-28 and n.6 (Souter, J., dissenting). The jury could conclude that this background alerted Sheriff Moore that there was an especially pressing need to train Burns, especially with respect to when and how to use force. Third, Sheriff Moore did not comply with the formal steps necessary to enroll Burns in CLEET training until after the incident, despite statutory requirements mandating him to do so. Thus, the jury could infer that Sheriff Moore knew that Burns was not attending CLEET, and conclude that Sheriff Moore was aware that Burns was all-the-more in need for some training, yet

15

decided not to require training for him. Fourth, despite availability of non-CLEET training options (e.g., the television training network), Sheriff Moore knew that no requirements or enforcement mechanisms existed to ensure that Burns availed himself of these alternatives. Fifth, Sheriff Moore had authorized Burns to engage in a wide latitude of conduct, with restrictions applied only to his driving and to his ability to carry a gun, knowing he had no training for the duties he might encounter. Sixth, Moore knew Burns had already arrested some individuals, i.e., he was engaging in conduct with the potential for harm and that required training. Burns testified he was authorized by Moore to make arrests. He had participated in twelve arrests prior to the Brown incident. Seventh, Moore knew that there were no formal departmental policies regarding supervision of junior officers to assist Burns or to limit his conduct. Moore admitted that he did not instruct deputies about their responsibilities to supervise a reserve deputy. In sum, we think on this evidence the jury reasonably could have concluded that Sheriff Moore made a conscious decision not to train Burns, yet still allowed him to make arrests.

2

We then turn to address whether municipal liability for failure to train can attach from a single decision of a policymaker. The County insists it cannot.

16

We think it is clear from the Court's decisions in <u>City of Canton</u>, 489 U.S. at 380 & 387, and <u>Bryan County</u>, that, under certain circumstances, § 1983 liability can attach for a single decision not to train an individual officer even where there has been no pattern of previous constitutional violations. We therefore turn to consider those two cases.

(a)

In <u>City of Canton</u>, 489 U.S. 378, a detainee brought a § 1983 suit against the city based on its failure to provide more medical training for a police station shift commander. The detainee alleged deprivation of her constitutional rights when the allegedly undertrained shift commander did not call for necessary medical care when she showed signs of serious illness. The record indicated that the city provided some medically-related training for its officers, including providing first-aid training. 489 U.S. at 391 n.11. There was no indication that such incidents were a recurring problem; that is, city liability was asserted on an apparent single incident of citizen injury. The Court, nevertheless, did not reject the plaintiff's failure-to-train claim as the basis for § 1983, but instead vacated and remanded the case for further proceedings on the grounds that the jury instructions fell below the "deliberate indifference" standard of proof required for liability to attach.

17

In City of Canton, the Supreme Court addressed several issues that are relevant to our consideration of the appeal before us. For the first time, the Court made clear that a municipality could be liable under section 1983 for the implementation of perfectly lawful and constitutional policies when a city employee applied the policy in an unconstitutional manner. Thus, the Court concluded that "there are limited circumstances in which an allegation of a 'failure to train' can be the basis for liability under section 1983." 489 U.S. 387. The basis for liability under such circumstances, however, is dependent upon the degree of fault evidenced by the municipality's action or inaction. In this respect, the Court concluded that "the inadequacy of police training may serve as the basis for section 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police comes into contact." Id. at 388.

City of Canton, we think, spoke rather directly to the facts in the case before us when it observed that with respect to specific officers, a need for more or different training can be so obvious and the inadequacy of training so likely to result in a violation of constitutional rights that the city can reasonably be said to have been deliberately indifferent to the need for training. Id. at 390.

Furthermore, the Court noted that the focus of the inquiry in determining city liability for failure to train must be "on the adequacy of the training program in relation to the tasks the particular officers must perform." Id. at 390. Here, for example, we must focus on the adequacy of training of Burns in relation to performing in an arrest situation. And City of Canton admonishes that we must examine the evidence for deliberate indifference of the county and not be satisfied with mere negligence in failing to train.

Finally, we think that City of Canton again spoke to the facts in this appeal in footnote ten. There it observed that it is a fact to a moral certainty that police officers are required to arrest fleeing felons. Thus, when the city arms its officers to carry out this task, there is thus the obvious need to train officers in the constitutional limitations on the use of deadly force. This need for training is so obvious that the failure to train is deliberate indifference to constitutional rights. This same observation, we think, may be applied in making arrests with force.

In sum, for purposes of considering the appeal before us, we draw the following guidance from City of Canton: The failure to train may be actionable under section 1983. Liability of the county depends upon whether it should have been obvious to Sheriff Moore--or stated differently, whether Sheriff Moore had sufficient

19

notice--that the failure to train Burns in his task of making arrests was likely to lead to a violation of the Fourth Amendment rights of those he would encounter. Furthermore, liability attaches only if there is direct causation between the policy and the injury. The City of Canton also suggests that a single incident of an alleged constitutional violation resulting from the policy may serve as a basis for liability so long as that violation was an obvious consequence of the policy. Thus, City of Canton is persuasive that a pattern of misconduct is not required to establish obviousness or notice to the policymaker of the likely consequences of his decision. As Justice O'Connor, the author of Bryan County, observed in her concurring opinion in City of Canton:

> Where a section 1983 plaintiff can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of constitutional rights of their citizens, the dictates of Monell are satisfied.

Id. at 396.

With City of Canton establishing some key principles for our consideration of this appeal, we now turn to Justice O'Connor's further refinement and development of those principles--particularly as relates to the liability of the county for a single decision by a policymaker--in Brown v. Bryan County, 520 U.S. 397.

(b)

As we have earlier noted, in Bryan County, considering the same facts in this appeal but in a different light, the Supreme

20

Court reversed the judgment to the extent that an inadequate hiring policy of the county was the basis for liability. The question presented to the Supreme Court was whether Sheriff Moore's decision to hire Burns constituted a policy that, under Monell, could trigger liability against the County. The Court acknowledged that earlier decisions of the Court may have indicated that a single decision attributable to a municipality could hold it liable. It distinguished those cases, however, because they involved formal decisions of municipal legislative bodies. Furthermore, in those cases, fault of the policymaker and causation between the policy and the injury were obvious. Bryan County, however, unlike other cases, presented a different kind of a case where the decision by the county to hire Burns was legal, and it was Burns, the employee, who used the illegal excessive force, and not the County itself. Where the County has not directly inflicted an injury, but the allegation is that the County has nevertheless caused an employee to do so (e.g., by failing to screen or train employees), "rigorous standards of culpability and causation must be applied to assure that the [county] is not held liable solely for the actions of its employees." Id. at 1389 or 405.

Addressing a case in which a plaintiff attempted to attach liability to a single decision of the county's policymaker, the Court made clear that, when "seeking to establish [county] liability on the theory that a facially, lawful [county] action has

21

led an employee to violate a plaintiff's rights[,] [the plaintiff] must demonstrate that the [county] action was taken with 'deliberate indifference' as to its known or obvious consequences." Id. at 407 (citing City of Canton). In reference to hiring cases, the Court emphasized that to hold the county liable for a single decision, there must be a high degree of predictability concerning the consequences of the challenged decision. In other words, a plaintiff must demonstrate that the decision in question reflects "deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." Id. at 411. Specifically, in order to find the county liable for a single decision of the policymaker, there must be evidence that would support a finding that it was obvious that the offending officer in question was "highly likely to inflict the particular injury suffered by the plaintiff." Id. at 412. Thus, the Court held that to test the link between Sheriff Moore's hiring decision and Jill Brown's injury, the lower courts should have asked whether Sheriff Moore should have concluded that Burns's use of excessive force in making arrests was a plainly obvious consequence of the sheriff's hiring decision. Id. at 411. The Court went on to hold that the evidence in this case was inadequate to support such a jury finding. In the absence of such a finding, Sheriff Moore was not deliberately indifferent to the plaintiff's Fourth Amendment rights in hiring Burns. Id. at 414.

22

Relative to the judgment we consider today, however, the Bryan County Court distinguished between liability imposed on the basis of a hiring decision and liability imposed on the basis of a county's failure to train. "[P]redicting the consequence of a single hiring decision . . . is far more difficult than predicting what might flow from the failure to train a single law enforcement officer as to a specific skill necessary to the discharge of his duties." 520 U.S. at 410. Acknowledging that City of Canton condoned municipal liability on the basis a single event of failing to train an employee, the Court rejected Jill Brown's attempt to analogize her hiring claim to failure-to-train cases because of the greater predictability of the consequences that flow from the failure to train an employee. The Court noted that the consequence of failing to train a single law enforcement officer as to a specific skill necessary to discharge his duties is far more predictable than is the consequence of a single hiring decision. Id. at 410.

Thus, although a hiring claim is clearly barred on the basis of the evidence before us in this appeal, we cannot accept the county's argument that Bryan County is a bar to considering whether the same evidence constitutes a basis for liability against the county under the plaintiff's failure to train claim. Indeed, the Bryan County Court noted that:

> In Canton, we did not foreclose the possibility that evidence of a single violation of federal rights,

23

accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential violation for such violation, could trigger municipal liability.

520 U.S. at 409.

We think the Supreme Court's decision in Bryan County simply makes clear that the evidence must withstand a vigorous test whether a reasonable jury could conclude: first, it should have been obvious to Sheriff Moore that the highly predictable consequence of not training Burns (and not providing supervision over his conduct when making an arrest) was that Burns would apply force in such a way that the Fourth Amendment rights of the citizens of Bryan County were at risk; and, second, that this failure to train or to provide supervision was "the moving force" that had a specific causal connection to the constitutional injury. In short, the evidence must establish, under the stringent standards of the Supreme Court's pronouncements in Bryan County, unmistakable culpability and clearly connected causation.[11]

---

[11]The County relies heavily on our decision in Snyder, a case that is distinguishable from the facts presented here. The holding of Snyder rested on grounds that the city's policymakers did not have sufficient notice of the stress problem to respond effectively. "There was no evidence showing that the city was aware of the supposedly high stress levels in the NOPD or knew that in the absence of a stress management program was likely to endanger the constitutional rights of its citizens." 142 F.2d at 799. Furthermore, the causal link was absent. "The evidence did not establish even a remote link between the city's failure to enact a stress management program and Snyder's injury." Id. In this appeal, both of these elements are met as we have explained.

24

We thus conclude that a single decision by a policy maker may, under certain circumstances, constitute a policy for which the County may be liable. We now turn to consider the requirements of City of Canton and Bryan County as they apply to this case.

B

Next, we consider the culpability element necessary to establish the County's liability. We conclude that the County's provision of no training (and no supervision) to Burns, on these facts, constitutes "deliberate indifference" to the health and safety of the citizens of Bryan County.[12]

First, we take it as elemental that police officers need at least some training to perform their job safely and effectively. Here, the evidence, including the expert testimony, supported this proposition. The jury was therefore justified to conclude that it was obvious to Sheriff Moore that officers without any training

---

[12]The jury instruction stated:

Sheriff B. J. Moore would have acted with deliberate indifference in adopting an otherwise constitutional training policy if in light of the duties assigned to Deputy Sheriff Stacy Burns the need for more or different training was so obvious and the inadequacy so likely to result in violations of constitutional rights, that Sheriff B. J. Moore can be reasonably said to have been deliberately indifferent to the constitutional needs of the Plaintiff.

By implication, the Court approved this instruction in Bryan County. 520 U.S. at 411. That this finding was not a *de facto* finding of negligence may be inferred from the jury's additional finding, Interrogatory No. 9, that the County was also negligent in the training of Burns.

25

have a high predictability of injuring citizens, routinely and unnecessarily, through use of improper techniques, improper force, and improper judgment calls. Our review of the record further indicates that the jury reasonably could have concluded that it was obvious new reserve officers, while being trained, require at least minimal supervision.[13]

That the County, through its policymaker, is culpable for purposes of § 1983 for its choice not to train Burns (and not to provide proper supervision for him), is illustrated by the facts giving notice to Sheriff Moore of the need to train and supervise Burns. Again, based on the family connection between Burns and Moore, and Moore's recent investigation of Burns's record, the jury reasonably could have inferred Sheriff Moore had full notice of the full extent of Burns's exuberant and reckless background. The same is true with respect to his record of on-the-job conduct in "taking down" a number of arrest subjects. On the stand, Burns admitted that, out of his twelve arrests, he had forced three or four individuals "to the ground," that is, between twenty-five and thirty-three percent of the total number of arrests. The plaintiff's expert testified this record was excessive. At

---

[13]Indeed, Oklahoma law would appear to require this supervision. See Op. Atty. Gen'l No. 85-46 (1985) ("'A sheriff or salaried deputy sheriff shall accompany a reserve force deputy sheriff in the performance of all duties assigned to such reserve force deputy sheriff unless such reserve deputy has completed the required one-hundred-twenty-hour basic police course.'")(quoting Okla. Stat. Ann. tit. 19 § 547(B)).

minimum, this record should have provided notice to Sheriff Moore that Burns was making arrests and using force on a regular basis. The County's sheriff force consists of only six regular deputies, and Burns had been on duty only four to five weeks. The jury could have reasonably believed that Sheriff Moore was aware of what Burns was doing in the field and knew training was required for Burns to perform such tasks. These facts bear on the high predictability of citizen injury by the untrained Burns and reinforce the jury's finding of deliberate indifference in this case.

The same observations apply to the facts showing no supervision of reserve officers. As we have discussed, the jury reasonably could have found that Burns remained, essentially, unsupervised. Sheriff Moore testified he did not authorize Burns to make arrests, and that he limited Burns's authority by refusing to allow him to carry a gun or drive while on duty. Moore also testified that he intended that Burns be supervised by a full-fledged deputy. Other testimony contradicted Sheriff Moore's claims with respect to proper supervision. First, Sheriff Moore could point to nothing to prove a policy of supervision except his assertion that such responsibility was "common knowledge." Morrison, the deputy accompanying Burns, testified that he had never been given any instructions from the Bryan County Sheriff's Department as to how he should work with a reserve deputy. When cross-examined in reference to his testimony that he told Burns about his limited authority to make arrests, Sheriff Moore could

27

say only that, "[h]e knew it."   Burns stated that Moore's only limitations on his activities were not being allowed to carry a gun or to drive a police car.   Indeed, Burns testified that Sheriff Moore had authorized him to engage in arrests.   Burns testified that he believed he had authorization from Moore to participate in the acts involved in the Brown pursuit and arrest, including use of the arm bar technique.   Sheriff Moore did not inform the deputy accompanying Burns that Burns was limited in his authorization.   At minimum, the policy of not supervising inexperienced officers could reasonably lead the jury to conclude that the failure to train made the County even more culpable for the constitutional injuries that followed.

Thus, we think the jury reasonably could have concluded that it was obvious to Sheriff Moore that his policy decision not to train Burns would result in a constitutional deprivation.   As a law enforcement officer, Sheriff Moore knew that all law enforcement officers, unless expressly restricted, will face situations calling for the application of force.   The jury reasonably could have found that with Burns there was an even greater magnitude of obviousness of the need for training and predictability of the consequences without training--rendering the degree of the County's culpability for the actions of Burns very high indeed.   In short, given the evidence that provided notice to Sheriff Moore of the highly predictable consequences of not training Burns--i.e., his youth, his personal record of recklessness and questionable judgment, his

28

inexperience, and his exuberance as a reserve deputy in the short time he had been on the force, and knowledge that forcible arrests were inevitable for a law enforcement officer--Sheriff Moore's considered policy decision not to require training for Burns can be said to constitute "deliberate indifference" to the Fourth Amendment rights of those citizens Burns would encounter.

C

Having concluded that the evidence supports a finding that Sheriff Moore consciously failed to train Burns, and having concluded that such a policy decision was the result of deliberate indifference to the rights secured under the Fourth Amendment, we now turn to consider whether there is sufficient causation between the policy decision and the injuries Jill Brown suffered to hold the County liable for those injuries.

Our review of the record convinces us that the jury had before it substantial testimony that much of the officers' conduct, and Burns's conduct in particular, during the incident was contrary to professional standards. According to the expert testimony, Burns violated basic standards of police conduct, standards that would have been taught Burns in any basic police training. The jury could have drawn inferences that the failure to have trained Burns to follow professional police standards was the moving force causing Brown's injuries. Specifically, on the evidence before it, the jury could have concluded that the County, abetted by its policy of failing to supervise untrained deputies, allowed Burns to

29

participate in the pursuit and arrest of Brown and that his lack of training in safety precautions and in arrest situations and in actually making the arrest, was the "moving force" that caused the injuries inflicted upon her.

As a preliminary matter, the jury heard expert testimony that the pursuit across state lines and the method of the stop were extraordinary and contrary to professional standards when the officers had no reason to suspect a felony violation. Indeed, the defendants admitted that they did not suspect any felonious behavior. Next, the testimony showed that the positioning of the patrol car vis-á-vis the Browns' pickup truck after the stop was highly unusual. Instead of positioning themselves in front of or behind the Browns' truck, Officer Morrison pulled alongside of it, a position labeled by the County's own expert as improper because it placed the officers in peril.

There was further expert testimony that Burns's subsequent actions demonstrated a lack of knowledge of basic police tactics. First, without pause and without ascertaining the Browns' intent, Burns immediately exited the patrol car and approached the Browns' vehicle. Instead of moving behind the truck, he crossed in front of the truck. In doing so, not only did he cross through Officer Morrison's line of fire, but during his approach to the passenger side of the Browns' truck he exposed himself to any risk the Browns may have posed. Third, testimony suggested that, despite the lack of light, Burns may not have used his flashlight to illuminate Ms.

30

Brown. Thus, he could not see with any clarity what she was doing in the truck cab.[14] Officer Morrison, however, testified that the Browns both raised their hands when so instructed. Fourth, Ms. Brown testified that Burns exposed himself to further danger by reaching across her to unbuckle her seat belt. Fifth, the risk Burns posed to Brown was aggravated by the officers' perception of a high-speed chase, when the danger of harm to officer and citizen as a result of lack of training is especially grave.[15] Indeed, the experts implied that the combination of a potentially dangerous situation and Burns's lack of a firearm may have led to his overreaction if Burns felt at risk, but did not have the proper tools to protect himself. The jury could reasonably have inferred that all of these enumerated professional failures on Burns's part, errors that were inconsistent with police training, created a situation that provoked a degree of fear for his safety, which prompted him to overreact. The jury reasonably could have inferred

---

[14]The two experts concurred that a subject may be slow to exit a vehicle for various reasons, e.g., he or she just woke up, does not speak English, suffers a mental deficiency, or is scared. Even if we viewed the evidence in a light most favorable to Burns, i.e., Brown was slow to exit the vehicle, the jury could have believed that Burns overreacted to the situation. The training deficiency may have had a direct causal relationship to Burns's actions that evening, according to Brown's expert.

[15]The plaintiff's expert testified that "the literature and personal experience indicate that the time at which the high-speed pursuit is terminated . . . and the officers exit the vehicles is the critical point at which there is a high likelihood or possibility for excessive use of force. . . . That's a particular and critical time for supervision and properly trained." [sic]

31

from the testimony, that with proper training Burns would have suggested that legitimate reasons existed to explain why an individual may be slow to exit a vehicle and thus Burns would not spontaneously have felt compelled to use force on someone who was offering no resistance. Finally, the absence of training is reflected in the injury that resulted to Brown, an injury that stemmed from what the testimony suggested is an extraction technique involving, properly applied, a minimum use of force. The jury could have reasonably concluded that, with training, Burns would have used the "arm bar" technique in a manner so as not to inflict injury.

The jury could have also concluded that the County's policy of not providing proper supervision, a component of the County's policy of no training (beyond the possible availability of CLEET), contributed to the causal force behind the constitutional deprivation suffered by Jill Brown. The evidence supports a conclusion that Burns was unsupervised and unarmed throughout the incident. His decision to join Morrison was his personal decision, made without supervisory approval. Officer Morrison himself stated that he was not in charge of Burns that evening. Morrison admits he gave Burns no explicit instructions before or during the episode. Burns testified that he received none. Given Burns's lack of training and lack of protection in the form of a sidearm, Ms. Brown's expert testified that Burns should never have been permitted to leave the vehicle. Morrison allowed Burns to exit the

32

vehicle, even though Morrison testified that he himself was in "great fear," and drew his weapon. Morrison knew that Burns did not have a gun. If there was a training program, according to the expert testimony that the jury could have believed, Morrison likely would have ordered Burns to remain in the patrol car. Finally, according to Brown's expert, the discovery record indicates a total absence of any communication or coordination between Morrison and Burns during the entire incident. The County's expert found fundamental fault in the supervisory relationship during the incident, a fault that contributes to the consequences of the lack of training.

In sum, the jury reasonably could have concluded that the County's decision not to train Burns, compounded by its policy of not requiring proper supervision, was the "moving force" behind the unconstitutional use of excessive force, which caused Brown's injury.

D

We sum up. Given our standard of review, we conclude that the evidence in the record allowed the jury reasonably to find that Sheriff Moore made a conscious decision not to train Burns, that because the need to train Burns was obvious, the failure to train him constituted "deliberate indifference" to the constitutional rights of the citizens of Bryan County, and that this decision was the "moving force" behind Brown's injuries. We therefore conclude that the decision not to train Burns was a policy choice on which

33

§ 1983 liability can lie.  Thus, the district court properly denied the County's motion for judgment as a matter of law.[16]

VI

On cross-appeal, Jill Brown challenges the district court's decision not to enter judgment in accordance with the jury's verdict on lost income and lost earning capacity, as well as for abstract constitutional injuries she suffered.  The jury awarded Brown $36,000 for lost income and $180,000 for lost earning capacity, and $100,000 in damages for her constitutional injuries.  In this respect, the County never raised any objection to her evidence, did not object to the jury's charge, and did not raise any objection to those damages in any postjudgment motions.  Despite this lack of objection by the County, the district court, *sua sponte*, as it had done in its first entry of judgment, again entered judgment upon our remand that struck Brown's economic damages and reduced her constitutional damages to a nominal $1.00.  Brown asks us to review these alleged errors of the district court and to restore these damage awards.

Because Brown failed to object to these reductions made by the district court, we consider the district court's rulings under a plain error standard.  We have defined "plain error" to mean "unobjected-to (forfeited) errors that are plain ('clear' or

---

[16]Having found that § 1983 liability was properly imposed in this case, we need not reach Brown's state law claims, which are duplicative of the federal claims we have decided.

34

'obvious') and affect substantial rights. . . . [W]e 'should correct a plain forfeited error affecting substantial rights if the error seriously affects the fairness, integrity or public reputation of judicial proceedings." Douglass v. United Servs. Automobile Assn., 79 F.3d 1415 (5th Cir. 1996) (quoting United States v. Olano, 507 U.S. 725, 732-37 (1993)); United States v. Calverley, 37 F.3d 160, 162-64 (5th Cir. 1993) (en banc). See also Johnson v. United States, 520 U.S. 461, 466-67 (1997):

> Under [the plain error] test, before an appellate court can correct an error not raised at trial, there must be (1) "error," (2) that is "plain," and (3) that "affect[s] substantial rights." If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings."

(Alterations in original.) The Supreme Court has explained these terms to the extent that (1) "clear" means "the error is clear under current law," Olano, 507 U.S. at 734, and that (2) "affects substantial rights" means that "the error must have been prejudicial: It must have affected the outcome of the district court proceedings." Id.

A

The district court's ruling on economic damages for lost income and earning capacity must be reversed.[17] Although Brown

---

[17]As we have indicated, on this second entry of judgment, after our remand, the district court struck, as it had done before, the verdict for damages for lost wages and future income. In our consideration of this question in the first appeal, we cited McCann v. Texas City Refining, Inc., 984 F.2d 667, 672 (5th Cir. 1993),

35

failed to preserve this error by a proper objection, we think the

district court's ruling constitutes plain error.[18]

In <u>Morante v. Am. Gen'l Fin. Center</u>, 157 F.3d 1006 (5th Cir.

1998), we said:

> It is well-settled in this circuit that a motion for
> judgment as a matter of law filed post verdict cannot
> assert a ground that was not included in the motion for
> judgment as a matter of law made at the close of the
> evidence.  <u>See</u> <u>Allied Bank-West, N.A. v. Stein</u>, 996 F.2d
> 111, 115 (5th Cir. 1993) (explaining that under Rule 50,
> a motion for directed verdict is a prerequisite and
> 'virtually jurisdictional' so that a motion for JNOV
> cannot assert a ground that was not included in the
> motion for directed verdict).  <u>See also</u> <u>Perricone v.
> Kansas City S. Ry. Co.</u>, 704 F.2d 1376, 1380 (5th Cir.
> 1983).  In <u>Sulmeyer v. Coca Cola Co.</u>, 515 F.2d 846 n.17
> (5th Cir. 1975), <u>this court explained that "[i]t would be
> a constitutionally impermissible re-examination of the
> jury's verdict for the district court to enter judgment</u>

_____

and recognized that the district court's <u>sua</u> <u>sponte</u> reduction of
the verdict was "constitutionally impermissible," 67 F.3d at 1182,
in that the County never made the proper objection in any
preverdict or postverdict motion (that is, an objection on the
specific ground that the evidence was insufficient to support this
portion of Brown's damage award).  We considered, however, the
district court's reduction under the plain error standard because
of Brown's failure to object to the district court's post-verdict
action.  Thus, we reviewed the evidence offered by Brown and
concluded that the district court was correct that Brown's evidence
of damages was "lacking."  Without citation to authority, we
stated, "the issue is not whether any evidence exists to support
the jury verdict.  Instead, the issue is whether the district
court's action constituted plain error."  <u>Id.</u>  For the reasons
stated here, our previous opinion (now vacated by the Supreme
Court) holding that the district court did not err, was incorrect.

[18]In its brief, the County makes no substantive argument for
the district court's striking the damage award for lost income and
lost earning capacity.  It insists only that the prior panel
opinion is "the law of the case."  As we have earlier noted, the
law of the case does not apply in this case where the Supreme Court
has vacated the judgment.

36

> n.o.v. on a ground not raised in the motion for directed
> verdict."

(Alteration in original.) See also WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE, § 2537, p. 349 & § 2540, pp. 368-69 (West 1995). Therefore, there is no doubt that district court's "constitutionally impermissible" action, exercised once again on remand, constitutes an error that was clear, or obvious, under existing precedent in this circuit. Second, the error unquestionably affected substantial rights because it affected the outcome of the proceedings, i.e., it reduced the judgment to Brown by a substantial amount. Lastly, we must conclude that the error "seriously affected the fairness, integrity, or public reputation of judicial proceedings." We reach this conclusion because the district court's *sua sponte* action constituted an unconstitutional invasion of those issues that are reserved for the jury's consideration in violation of Brown's Seventh Amendment rights because Brown introduced some evidence of her injuries justifying submission of the issue to the jury;[19] and, second, the court ruled

---

[19]Our decision here differs with the conclusion we reached on prior consideration because, there, we applied an improper evidentiary test to this reduction. This case presents the rare instance of a district court's *sua sponte* action without a defendant's sufficiency of the evidence motion. Usually, plain error is applied when the defendant on appeal argues that, despite its failure to object below, there is insufficient evidence to support the judgment. The question the appellate court must ask is whether the plaintiff presented any evidence to support the verdict. See Sharp v. City of Houston, 164 F.3d 923, 932 (5th Cir. 1999) ("Under the plain-error review, the inquiry is whether the plaintiff has presented any evidence in support of his claim."); Polanco v. City of Austin, 78 F.3d 968, 974 (5th Cir. 1996);

based on an unargued, uncontested view of the evidence on which "the nonmovant has [not] had the opportunity to cure any insufficiencies." See Purcell v. Seguin State Bank and Trust Co., 999 F.2d 950, 956 (5th Cir. 1993) (explaining purposes of Rule 50 motion). Thus, under the authority cited above, we hold that the district court committed plain error when it reduced the jury's verdict for lost wages/earning capacity damages in the absence of a proper and timely motion from the defendant.

B

We now consider the district court's reduction of the $100,000 the jury awarded to Brown as damages for deprivation of her constitutional right not to be subjected to excessive force ($50,000) and for her loss of liberty ($50,000). We have reviewed the district court's Judgment, March 31, 1998 Order, and supporting June 22, 1998 Memorandum Opinion and Order. We find that the decision to strike the $100,000 damage award for violation of Brown's constitutional rights does not constitute plain error. The only error the district court made in this respect was submitting this issue to the jury.

---

McCann, 984 F.2d at 673 ("[T]he question before this court is not whether there was substantial evidence to support the jury verdict, but whether there was any evidence to support the jury verdict."). See also Childress & Davis, Federal Standards of Review, Vol. I, 3d ed. (LEXIS 1999), § 3.15, pp. 3-115-3-119. The prior panel, however, engaged in a weighing of the evidence, upholding that the district court's conclusion that the evidence offered by Brown was "lacking" in sufficiency. That was an incorrect approach.

38

Under clearly established jurisprudence, "the abstract value of a constitutional right may not form the basis for § 1983 damages." Memphis Community Sch. Dist. v. Stachura, 477 U.S. 299, 308 (1986). See also id. at 306-06; Hay v. City of Irving, Texas, 893 F.2d 796, 800 (5th Cir. 1990). Therefore, this damage question should never have been submitted to the jury and no argument can be made that the district court infringed upon Brown's Seventh Amendment rights by taking the matter from the jury post-verdict. As there was no basis for the award, this verdict represents a windfall to which Brown is not entitled. Therefore, this reduction does not affect the substantial rights of Brown. Consequently, the integrity of the proceedings was not affected by the district court's action; indeed, to allow it to stand would be to affect seriously the integrity of the judicial proceeding. Thus, we affirm the judgment in this respect.

We therefore will reinstate the reductions in the jury verdict only with respect to Brown's lost income/earning capacity damages.

## VII

The County also claims that the district court erred by failing to offset Brown's recovery by $5,001.75 that the Supreme Court awarded to the County as costs. Brown does not respond to this argument in her brief. Those costs may be offset against Brown's recovery.

## VIII

39

In sum, we hold that on the facts of this case, the district court properly rejected the County's motion for judgment as a matter of law on Brown's § 1983 failure-to-train claim. We affirm the district court's elimination of Brown's award for those intangible damages she suffered because of the County's violation of her constitutional rights. We reverse, however, the district court's decision to cut Brown's damages for lost income and earning capacity. Otherwise we affirm the award of all other sums to Brown as damages and fees.[20] We offset Brown's award by any costs awarded to the County by the Supreme Court.

IX

For the reasons we have stated in this opinion, the judgment of the district court is affirmed as modified in accordance with this opinion and

> REMANDED to the district court for entry of
> judgment consistent with this opinion

ENDRECORD

---

[20]The jury also awarded Brown damages for past physical pain ($5000), future physical pain ($10,000), past mental pain and anguish ($1,000), future mental pain and anguish ($1,000), past physical impairment ($75,000), future physical impairment ($300,000), past disfigurement ($1,000), future disfigurement ($2,000), damage to reputation ($500), past medical expenses ($65,802), and future medical expenses ($90,000). The jury also awarded Brown $20,000 in punitive damages, to be recovered from Stacy Burns. Finally, the jury awarded Brown $77,500 in attorneys' fees. The district court ordered all sums to be subject to post prejudgment and post-judgment interest.

40

DeMOSS, Circuit Judge, dissenting:

This appeal is the latest in a series of appeals which deal with the same factual and legal claims between the same parties. For ease of reference, these are defined as follows:

(1)  Brown v. Bryan County, 53 F.3d 1410 (5th Cir. 1995) (hereinafter "Brown I")

(2)  Brown v. Bryan County, 67 F.3d 1174 (5th Cir. 1995) (hereinafter "Brown II")

(3)  Board of County Comm'rs of Bryan County v. Brown, 117 S. Ct. 1382 (1997) (hereinafter referred to as the Supreme Court decision in Brown)

(4)  Brown v. Bryan County, No. 98-40877 (5th Cir., argued October 6, 1999) (hereinafter Brown III or the current appeal).

My review of the history of this long-term, complicated, and at times acrimonious litigation has persuaded me that our Court has made some errors in processing these appeals which deserve recognition and correction as part of the resolution of the current pending appeal.

My concerns relate to the confusing and anomalous treatment of the claims of liability against Bryan County (the "County") under § 1983 which is reflected in these various opinions.  Here are the specifics.

In Brown I, the original panel of this Court discussed the liability of Bryan County in Part VI of that opinion.  In Part VI(A), a majority of the panel determined that the jury findings supported a determination of liability on the part of Bryan

41

County because Sheriff Moore's decision to hire Burns without proper investigation amounted to deliberate indifference to the public welfare. In Part VI(B), the original panel unanimously determined that no recovery against Bryan County could be based on the theory of failure to properly train Burns after hiring because our Circuit's clear precedents require more than a single instance of injury or an isolated case of one poorly trained employee for municipal liability to attach. Judge Emilio Garza dissented on the basis that liability against Bryan County could not be sustained because one inadequate background investigation, even by a municipal policy maker, is not enough to constitute "the unconstitutional municipal policy" contemplated by Monell.

Following issuance of this opinion on June 2, 1995, another judge of this Court held the mandate and initiated correspondence with the original panel because the portion of Brown I holding the County liable was in conflict with a prior decision of this Circuit in Stokes v. Bullins, 844 F.2d 269 (5th Cir. 1988). Also, Bryan County filed a motion for panel rehearing and a suggestion for en banc reconsideration as to the portion of Brown I which held the County liable for an inadequate hiring policy. Mrs. Brown did not file any motion for panel rehearing or en banc reconsideration.

Considerable exchange of memoranda finally resulted in a decision by the original panel in October 1995 to rewrite its opinion and substitute a new opinion, <u>Brown II</u>, for <u>Brown I</u>. Apparently, the purpose of this rewrite was to minimize the "en banc worthiness" of the new decision by making clear that the affirmance of the County's liability was based on the particular factual determinations by the jury relating to the inadequacies of the investigation and the inappropriateness of Burns' prior "criminal" record. In accomplishing the rewrite, however, all of Part VI(B), which determined that the County was not liable on any failure-to-train theory, was omitted.

I have not found any indication in the record to suggest that Part VI(B) was intentionally omitted in the redrafting which produced <u>Brown II</u>. I have great difficulty in understanding why Part VI(B) was omitted and have concluded that it must simply have been an inadvertent omission. Clearly, the text of Part VI(B) of <u>Brown I</u> was a completely accurate summary of our Circuit's law on failure-to-train cases; and so far as I can tell, no party nor any judge on our Court raised any question as to the validity or accuracy of that text. If Part VI(B) had been left in <u>Brown II</u>, Mrs. Brown would have had an occasion to file a motion for panel rehearing or en banc reconsideration as to that issue. And failing relief by rehearing or en banc reconsideration, Mrs. Brown would have had an opportunity to apply for a writ of certiorari to the Supreme Court as to the

43

correctness of the decision in Part VI(B) regarding the County not being liable for failure-to-train.

I note that in both Brown I and Brown II there is a short paragraph following the title "DISCUSSION" which includes the following sentence in both opinions: "For efficiency's sake, we will address only those points that we believe merit review." Obviously, in Brown I the panel felt the discussion in Part VI(B) merited review because Part VI(B) dealt with a theory of recovery which was actually tried before the jury, and as to which Bryan County preserved error in the district court, and the topic was fully briefed on appeal. Why the original panel determined that Part VI(B) no longer merited review in the redrafting which produced Brown II is truly a puzzle to me.[21]

After issuance of Brown II, our Court voted not to give en banc reconsideration to this appeal, and Bryan County applied for a writ of certiorari to the Supreme Court which was granted. In its opinion, the Supreme Court noted:

---

[21]    It occurs to me that the original panel majority may have assumed that (i) en banc reconsideration of its affirmance of County liability on the improper hiring theory was so unlikely and (ii) a writ of certiorari from the Supreme Court on this same issue was likewise so unlikely that discussing an alternative theory of liability (i.e. failure-to-train) was simply not worth the paper it would be written on. If so, this case is a clear demonstration of the risks of assuming what a higher court will do. Surprise, surprise, the Supreme Court not only granted certiorari but reversed the district court and our Court by holding that the jury instructions on improper hiring were not adequate and that the evidence was not sufficient to support the necessary findings -- the very aspects which the panel majority thought would insulate this case from further review.

44

> The [Fifth Circuit] court held, among other
> things, that Bryan County was properly found
> liable under § 1983 based on Sheriff Moore's
> decision to hire Burns. The court addressed only
> those points that it thought merited review; <u>it
> did not address the jury's determination of county
> liability based on inadequate training of Burns,
> nor do we</u>. We granted certiorari to decide
> whether the County was properly held liable for
> respondent's injuries based on Sheriff Moore's
> single decision to hire Burns. We now reverse.

<u>Brown</u>, 117 S. Ct. at 1386-87 (citations omitted) (emphasis added). The Supreme Court vacated the judgment of the Fifth Circuit and remanded the case "for further proceedings consistent with this opinion." <u>Id.</u> at 1394. When this appeal arrived back in our Court, the original panel promptly remanded it to the district court, and in so doing, I think the original panel clearly erred. In my view, upon remand from the Supreme Court, the original panel should have taken two steps:

a. First of all, the panel should have determined the portions of <u>Brown II</u> which had not been reversed by the Supreme Court. Clearly, the portions of <u>Brown II</u> which discuss the liability of Reserve Deputy Burns individually and the quantum of damages had not been changed in any way by the Supreme Court decision, and an order affirming the district court's determination of liability against Deputy Burns individually and the quantum of damages resulting therefrom could have and should have been issued to effect a final disposition thereof; and

b. The original panel should have determined the question of whether or not the County could be liable on a theory of

failure-to-train Deputy Burns.  As indicated earlier, the theory of failure-to-train had been actually tried to the jury, error in regard thereto had been preserved by the County, the theory had been briefed and argued on appeal, and the original panel had in fact decided that our Circuit law would not permit such a recovery in Part VI(B) of <u>Brown I</u>.  In my view, our Court has a clear duty to decide all issues raised on appeal; and deciding not to decide (or inadvertently failing to decide) is just as big an error as deciding contrary to existing case law precedent in our Circuit.

Given the settled status of our Fifth Circuit case law on the failure-to-train theory, I think the original panel clearly should have issued a supplemental opinion holding that recovery against Bryan County could not be made on the failure-to-train theory; and in view of the Supreme Court decision holding that Bryan County could not be held liable on the improper hiring theory, the original panel should have instructed the district court to enter a judgment that Mrs. Burns take nothing from Bryan County under § 1983.  Obviously, that supplemental holding could and probably would have been the subject of an application for writ of certiorari by Mrs. Brown to the Supreme Court.  If certiorari had then been granted, the Supreme Court would have then had the occasion to expressly state what distinctions, if any, there may be between the improper hiring theory and the failure-to-train theory insofar as County liability is concerned.

46

Instead of taking either of the steps suggested in the preceding subparagraphs, the original panel simply entered an order remanding this appeal to the district court "for consideration in conformity with the opinion of the Supreme Court." Brown v. Bryan County, 117 F.3d 239, 240 (5th Cir. 1997). When the case got back to the district court, each side promptly filed motions for judgment as a matter of law. No further evidence or testimony was presented by either party. The district court, therefore, had no evidence before it which it did not have at the time of the original trial four years earlier. The only new thing which the district court had after remand which it didn't have at the time of the original trial was the Supreme Court decision in Brown itself and the rather disingenuous arguments made by counsel for Mrs. Brown that this Supreme Court decision cast a whole new light on the question of municipal liability in failure-to-train cases. This argument was made in the face of the express statement by the Supreme Court that it was NOT addressing a failure-to-train claim in its opinion. When the Supreme Court says it is not addressing a claim in its opinion, I think we should take them at face value and not allow extrapolations of dicta in that opinion to have any effect on the status of our Circuit's settled law -- i.e., in this case that failure-to-train claims require a pattern or history of other incidents to support deliberate indifference on the part of the municipality.

47

Not surprisingly, the district court again found that the evidence was sufficient to support the jury's finding of liability on the failure-to-train theory.  I am disturbed by the facility with which the district court simply ignored what was then the most recent decision of our Circuit reaffirming and reapplying the rule that a failure-to-train claim had to be based on more than one instance.  See, Snyder v. Trepagnier, 142 F.3d 791 (5th Cir. 1998), cert. granted, 119 S. Ct. 863, cert. dismissed, 119 S. Ct. 1493 (1999).  As a result, the more or less automatic and unstructured remand by the original panel to the district court proved to be not only a terrible waste of judicial resources and duplication of effort, but also provided Mrs. Brown with a dramatic "second bite at the apple" on her liability claims by permitting a reassessment of the failure-to-train theory by the same district judge whose holding on that same issue was determined to be inconsistent with Fifth Circuit precedent by Part VI(B) of Brown I.

Bottom line, it seems to me that the best way to extricate this Court from this convoluted mess is simply to "fess up" that the original panel inadvertently omitted Part VI(B) in the redrafting between Brown I and Brown II and that upon remand from the Supreme Court, the original panel inappropriately remanded to the district court without first deciding the issue of liability on the failure-to-train theory which was appropriately before it. The solution then is for this present panel to do now what the

48

original panel should have done upon remand from the Supreme Court, i.e., issue a supplemental decision which (i) reaffirms the decision of the district court assessing liability against Deputy Burns individually and fixing damages as determined by the district court; (ii) reverses the decision of the district court as to liability on the part of Bryan County on the theory of failure-to-train; (iii) recognizes that the Supreme Court has determined that liability upon Bryan County for improper hiring is not supportable factually or legally; and (iv) directs the district court to enter judgment that Mrs. Brown take nothing from Bryan County under her claims for deprivation of constitutional rights under § 1983.

Obviously, the foregoing analysis has fallen on the deaf ears of the current panel majority. In their haste to find a "deep pocket" from which Mrs. Burns may recover the compensation determined by the district court, the current panel majority articulates a variety of new theories with which I must, respectfully, disagree. First and foremost, the current panel majority overstates the impact of the Supreme Court decision in Brown on the decision of this Court in Brown II. Second, the current panel majority ignores the clear line of Fifth Circuit precedent which establishes the criteria necessary to establish municipal liability for failure-to-train. Finally, the current panel majority misapplies dicta in the Supreme Court decision on

49

the issue of hiring as being controlling on the issue of failure-to-train.

### Does the Supreme Court Decision in Brown Vacate the Entirety of the Fifth Circuit Decision in Brown II?

After our circuit issued its opinion in Brown II, the only party to apply for writ of certiorari to the Supreme Court was Bryan County which asked for a review of the holding in Brown II that it was liable under § 1983 for inadequate hiring decisions. Deputy Burns did not ask for a writ of certiorari on the portion of Brown II which affirmed his liability under the jury verdict for wrongful arrest and use of excessive force. Mrs. Burns did not apply for a writ of certiorari on the portion of Brown II which affirmed the district court's determination of the quantum of damages. The Supreme Court granted certiorari as to the writ requested by Bryan County and determined that the district court and our court had erred in finding that Bryan County was liable under Section 1983 for "Sheriff Moore's single decision to hire Brown." Accordingly, the Supreme Court decision in Brown concludes with the following statement:

> We therefore vacate the judgment of the Court of Appeals and remand this case for further proceedings consistent with this opinion.

117 S. Ct. at 1394.

The current panel majority in this appeal concludes, as indicated by footnotes 1 and 17 of the majority opinion, that

this ending direction from the Supreme Court is a complete vacatur of the entirety of this Court's decision in Brown II and that, consequently, Brown II no longer constitutes "the law of the case" in any respect. In support of this conclusion, this current majority relies upon quotations from two Supreme Court cases in footnote 1. Standing alone, these quotations seem to support the majority's position, but when read in the context of the cases from which they are taken, it is obvious that these two quotations were part of larger directives being issued by the Supreme Court in those cases, which required the remanding of those cases to the lower courts for consideration of events that had occurred while those particular cases were on appeal. In effect, the current panel majority attempts to draw a general rule out of specific directions issued in cases which are totally different from Brown from a procedural standpoint.

It seems axiomatic to me that since neither Deputy Burns nor Mrs. Brown attempted to appeal from the decisions in Brown II, relating to Deputy Burn's liability and the quantum of damages, those parts of Brown II would clearly become final and constitute law of the case, if not res judicata, as to those matters. Consequently, our original panel erred when it decided to remand this case to the district court without specifying that such matters were not to be reopened. In point of fact, the district court seems to have assumed that these matters were law of the

case, for in issuing its new opinion on remand, the district court spoke only as to the liability of Bryan County, and it ended up determining the same quantum of damages that it had determined at the time of the original trial.  Consequently, in my view, Mrs. Brown had no basis whatsoever for seeking to reopen the damage determination with the district court, and the current majority errs in deciding to permit reconsideration of that damage determination by the district court and in awarding Mrs. Brown a recovery in a quantum greater than that which she declined to appeal from in Brown II.

In issuing its directive at the end of the majority opinion in Brown, the Supreme Court said absolutely nothing about remanding the case to the district court for "reconsideration by the district court" of any of the issues on appeal in Brown II. The Supreme Court decision dealt solely with the single issue as to which certiorari had been granted, and nothing in the Supreme Court decision in Brown can be deemed a mandate to reopen either the quantum of damage issue or the question of the liability of Deputy Burns.

What Effect Does the Supreme Court Decision in Brown have on the Law Determining the County's Liability under Section 1983 for Failure-to-train?

As indicated earlier in this dissent, the Supreme Court expressly indicated that it was not addressing the theory of County liability based on inadequate training of Deputy Burns

52

because that theory had not been addressed by our Court in <u>Brown II</u>.  Despite this express disclaimer, Mrs. Brown and the majority both urge a reading of the Supreme Court decision in <u>Brown</u> that would clearly authorize a holding of County liability under § 1983 based upon the jury findings and instructions given on the failure-to-train theory in this case.  When the Supreme Court expressly says it is not addressing an issue in a case, I think we should be very cautious about drawing inferences and implications on an issue from the text of its opinion.  But that is precisely what the majority does.  In footnote 12, the majority states that "by implication," the Supreme Court approved the jury instructions given to the jury in this case on inadequate training and cites a particular page in the Supreme Court opinion as authority for this statement.  There is absolutely nothing, however, on that page of the Supreme Court opinion in <u>Brown</u> which addresses the jury instruction on "inadequate training."  Rather, what is discussed on that page is the jury instruction on the improper hiring theory, which the Supreme Court recognized was "analogous to that reserved in <u>City of Canton</u>," but which the Supreme Court determined on the next page was inadequate and insufficient to properly present the issue of inadequate screening before hiring.

Specifically, the Supreme Court said that the district court's instruction on inadequate screening before hiring was

53

defective because: (1) it did not specify that the applicant being considered "was highly likely to inflict the particular injury suffered by the plaintiff"; and (2) because it failed to require a finding that Burn's background "made his use of excessive force in making an arrest a plainly obvious consequence of the hiring decision."  <u>Brown</u> 117 S. Ct. at 1390.

It will be apparent to anyone reading the Supreme Court decision in <u>Brown</u> that the Court drew certain distinctions between § 1983 liability based upon inadequate screening before hiring and § 1983 liability based upon failure-to-train.  It will also be apparent to anyone reading the Supreme Court decision in <u>Brown</u> that the Court concluded that the proof requirements and the jury instruction requirements on inadequate screening before hiring claims should be more stringent than those applicable to failure-to-train claims.  Those differing requirements are necessary to:

> (1)  Avoid the "danger that a municipality will be held liable for an injury not directly caused by a deliberate action attributable to the municipality itself"; and
>
> (2)  In order to "prevent municipal liability for a hiring decision from collapsing into respondeat superior liability."

<u>Brown</u>, 117 S. Ct. at 1391.

54

But the simple fact that the Supreme Court declined to accept Mrs. Brown's "proffered analogy" between failure-to-train and inadequate screening cases says very little, if anything, about whether the Supreme Court intended to erect a new or different set of criteria for analyzing a failure-to-train theory.

In short, the Supreme Court decision in Brown on the inadequate screening claim, says absolutely nothing about changes in the criteria for analyzing a failure-to-train claim.

Impact of Supreme Court Decision
In Brown on Fifth Circuit Precedent
Defining Criteria for Failure-to-train

At the time the original panel issued Brown I in this case, this Circuit had a clear and consistent precedent that in order to recover against a municipality under § 1983 on a failure-to-train claim, the plaintiff must establish something more than a single instance of injury or an isolated case of one poorly trained employee. See, e.g., Languirand v. Hayden, 717 F.2d 220 (5th Cir. 1983) (holding that in failure-to-train cases, the plaintiff must establish a pattern of similar incidents in which citizens were injured or endangered by intentional or negligent police misconduct, or that serious incompetence or misbehavior was general or widespread throughout the police force); Rodriquez v. Avita, 871 F.2d 552 (5th Cir. 1989) (discussing Languirand and concluding that municipal liability could not be derived from a

single incident of improvident discharge of a firearm by an officer); and <u>Fraire v. City of Arlington</u>, 957 F.2d 1268, 1278 (5th Cir.) (holding that, in failure-to-train cases "isolated violations are not the persistent, often repeated constant violations that constitute custom and policy"), <u>cert. denied</u>, 113 S. Ct. 462 (1992). The original panel relied on this precedent in holding in Part VI(B) of <u>Brown I</u> that Mrs. Brown could not recover against Bryan County for failure-to-train. Our Circuit's decision in <u>Lanquirand</u> was decided before the Supreme Court decision in <u>City of Canton</u>, but it was referred to favorably by the Supreme Court in <u>City of Canton</u> as one of the Circuit cases that establishes the "deliberate indifference" standard for municipal conduct. <u>Rodriquez</u> and <u>Fraire</u> were decided after <u>City of Canton</u>. In writing Part VI(B) of <u>Brown I</u>, the original panel expressly referenced the Supreme Court decision in <u>City of Canton</u> and expressly utilized the following quotation from that case:

> That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program.... Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct.

<u>City of Canton</u>, 109 S. Ct. at 1206.

As indicated earlier in this dissent, I recognize that Part VI(B) of <u>Brown I</u> was inadvertently omitted in the rewrite that produced <u>Brown II</u>. As indicated earlier in this dissent, I

56

recognize that Part VI(B) of <u>Brown I</u>, in which a majority of this Court held that the same evidence before the Court in this appeal failed to establish the County's liability for failure-to-train, was inadvertently omitted in the rewrite that produced <u>Brown II</u>. But our Circuit has traditionally followed a rule of orderliness that a subsequent panel may not reach a decision inconsistent with the decision of a prior panel unless there has been an en banc decision of our Court or a Supreme Court decision to the contrary. <u>See</u>, <u>e.g.</u>, <u>Grabowski v. Jackson County Pub. Defenders Office</u>, 47 F.3d 1386, 1398-1403 (5th Cir.) (Smith, J., concurring in part and dissenting in part), <u>vacated for reh'g en banc</u>, <u>id</u>. at 1403, <u>district court judgment aff'd</u>, 79 F.3d 478 (5th Cir. 1996) (en banc); <u>see also</u> <u>Arnold v. U.S. Dep't of Interior</u>, No. 99-10753, 2000 WL 679785, at *5 (5th Cir. May 25, 2000); <u>Teague v. City of Flower Mound</u>, 179 F.3d 377 (5th Cir. 1999); <u>Lowrey v. Texas A & M Univ. Sys.</u>, 117 F.3d 242, 247 (5th Cir. 1997).

Likewise, our Circuit also has a policy that requires a subsequent panel to give deference under the law of the case doctrine to a holding of a prior panel in the same case. <u>See</u>, <u>e.g.</u>, <u>Beets v. Johnson</u>, 180 F.3d 190 (5th Cir. 1999) (applying law of the case doctrine to decline reconsideration of an issue decided in a previous appeal), <u>cert. denied</u>, 120 S. Ct. 946 (2000); <u>Quest Medical, Inc. v. Apprill</u>, 90 F.3d 1080, 1094 (5th Cir. 1996); <u>United States v. Singleton</u>, 49 F.3d 129, 134 (5th

Cir.); <u>Griffin v. Box</u>, 956 F.2d 89, 93 (5th Cir. 1992). The law of the case doctrine should foreclose reconsideration of the quantum of the damages in this case and reconsideration of the issue of municipal liability under § 1983 for failure-to-train in this case. Law of the case is a prudential doctrine -- a principle that "issues once decided in a case that recur in later stages of the same case are not to be redetermined." <u>See</u> Jack H. Freidenthal, <u>Civil Procedure</u> § 14.1 (2d ed. 1993) (citing Allen D. Vestle, <u>Law of the Case: Single Suit Preclusion</u>, 1967 Utah L. Rev. 1. <u>See</u> <u>generally</u> <u>Lincoln Nat'l Life Ins. Co. v. Roost</u>, 306 F.2d 110 (5th Cir. 1962) (en banc). "As most commonly defined, the [law of the case] doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." <u>Arizona v. California</u>, 103 S. Ct. 1382, 1391 (1983).

Admittedly, both the rule of orderliness and the law of the case doctrine are prudential in nature and do not actually subtract from a court's power to decide. But despite the prudential nature of these rules, this Court has consistently adhered to them. Moreover, while the circumstances in this case which resulted in Part VI(B) of <u>Brown I</u> being dropped out of the original panel's decision in <u>Brown II</u> are somewhat peculiar and anomalous, I think the policies behind these rules justify their application in this case. First of all, the record in this case

is identical in all material respects to the record presented to the panel in <u>Brown I</u> and <u>Brown II</u>, which the prior panel found insufficient to establish the County's liability for failure-to-train. Second, the procedural posture of this case is in all material respects identical. While the case has been appealed to the Supreme Court and remanded to the district court, the district court merely entered judgment as a matter of law on the basis of the jury findings without the benefit of any new evidence. Our task, therefore, remains the same as that presented in both <u>Brown I</u> and <u>Brown II</u>, which is to measure the adequacy of the trial record under the controlling legal standards. In this vein, the original panel's determination that the record simply does not measure up may not be binding or mandatory, but I see no basis for saying that the prior work by a three-member panel of this Court in a prior appeal involving the same issues, the same parties, the same record, and the same procedural posture is not entitled to any deference whatsoever. Indeed, such an approach is inconsistent with the prudential rules by which we govern ourselves as a collegiate court.

Unfortunately the current panel majority simply ignores both the existing Fifth Circuit precedent and our prudential rule of orderliness. In so doing, I think they err grievously. They obviously do not cite any en banc decision of this Circuit which changed or overruled the precedent established by <u>Languirand</u>,

59

Rodriquez, and Fraire. Likewise, the current panel majority does not cite a Supreme Court case which holds that the requirement of our Circuit precedent of a pattern of prior incidents being necessary to establish deliberate indifference on the part of a municipality under § 1983 is no longer the law. Instead, the current panel majority purports to rely upon various portions of City of Canton, particularly footnote 10 of that opinion. But each and every one of those portions of the City of Canton opinion which the panel majority now relies on to support its holding were available for reading and interpretation by the original panel in this case, by the panel in Fraire, and by the panel in Rodriquez.

In short, three panels of this Court have read the very same Supreme Court language and reached the conclusion that municipal liability under § 1983 should not be fixed on the basis of a single incident which is attributable to failure-to-train. The current panel majority, however, reached the opposite conclusion. The panel's reference to footnote 10 is particularly troublesome. In this case, Deputy Burns was not authorized to carry a weapon, and he did not, in fact, carry or use a weapon on the occasion of the arrest involved in this case. There is no testimony in this case which would show that use of the arm-bar take down technique constitutes the use of deadly force. Consequently, this case does not come anywhere near involving the example cited by the

Supreme Court in <u>City of Canton</u> as a need for training which is so obvious as to constitute deliberate indifference on the part of the municipality without any history of prior circumstances.

<u>What Impact Does the Supreme
Court Decision in Brown Have on
The Supreme Court Decision in City of Canton?</u>

Both the current panel majority and Mrs. Brown's brief take the position that the Supreme Court decision in <u>Brown</u> should be read as elaborating upon and extending the holding in <u>City of Canton</u> that an inadequate training claim could be the basis for 1983 liability in limited circumstances. I suggest, however, that the Supreme Court in <u>Brown</u> was actually limiting and restricting the language of <u>City of Canton</u>. Read the following quotation in which Justice O'Connor, speaking for the majority in <u>Brown</u> said:

> We spoke, however, of a deficient training "program," necessarily intended to apply over time to multiple employees. <u>Id</u>. at 390, 109 S. Ct. at 1205. Existence of a "program" makes proof of fault and causation at least possible in an inadequate training case. If a program does not prevent constitutional violations, municipal decisionmakers may eventually be put on notice that a new program is called for. Their continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action--the "deliberate indifference"-- necessary to trigger municipal liability. <u>Id</u>. at 390, n.10, 109 S. Ct. at 1205 n.10 ("It could ... be that the police, in

61

> exercising their discretion, so often violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers, who, nevertheless, are 'deliberately indifferent' to the need"); id. at 397, 109 S. Ct. at 1209 (O'CONNOR, J., concurring in part and dissenting in part) ("[M]unicipal liability for failure to train may be proper where it can be shown that policymakers were aware of, and acquiesced in, a pattern of constitutional violations...."). In addition, the existence of a pattern of tortious conduct by inadequately trained employees may tend to show that the lack of proper training, rather than a one-time negligent administration of the program or factors peculiar to the officer involved in a particular incident, is the "moving force" behind the plaintiff's injury. See id., at 390-391, 109 S. Ct. at 1205-1206.

Brown, 117 S. Ct. at 1390.

Note the repeated emphasis on the word "program" and note the use of the plural form of the words "violations" and "employees," both of which necessarily indicate instances of more than one violation by more than one officer.

Moreover, note the existence of the reference to "existence of a pattern of tortious conduct." Each of these comments by the Supreme Court in Brown demonstrate that what it was saying in City of Canton is that the surest way to establish the required deliberate indifference on the part of the municipality is to prove that its training program has failed to prevent more than one constitutional violation by more than one employee over a

62

period of time, and that such proof would support a finding of deliberate indifference by the municipality.

Also, in explaining why the analogy urged by Mrs. Brown between failure-to-train cases and inadequate screening cases was not persuasive, the Supreme Court in Brown stated the following:

> In leaving open in Canton the possibility that a plaintiff might succeed in carrying a failure-to-train claim without showing a pattern of constitutional violations, we simply hypothesized that, in a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.

Brown, 117 S. Ct. at 1391.

Note, first of all, the characterization of the language in Canton as a hypothesis not a holding. Note next that the Supreme Court in Brown characterized the applicability of the language in Canton as applying to "a narrow range of circumstances," but the Supreme Court in Brown did not add any further examples beyond those already mentioned in City of Canton as to circumstances which would fit in this narrow range.

Finally, note that the Supreme Court decision in Brown, upgraded the probability of a violation of constitutional rights occurring in an improper hiring case from "so likely to result," as stated in City of Canton, to "highly predictable consequence." These same language distinctions are at the root of the Supreme Court's analysis as to why the jury instructions in Brown on the

63

inadequate hiring issue which was before it were defective.  The jury instructions and issues on failure-to-train given by the district court were virtually identical to the jury instructions on inadequate hiring.  As I have stated earlier, I do not think the Supreme Court in <u>Brown</u> spoke in any way to the jury instructions and issues on failure-to-train.  But since we are now asked to make an educated guess as to what we think the Supreme Court would do with the failure-to-train instructions and jury issues in this case, if, as, and when, those matters get before the Supreme Court, I would put my money on the Supreme Court finding them deficient for two reasons: first, because they inquire about the deficiency of training of an individual, not the deficiency of a training program; and second, because they lack the specificity of constitutional violation and set too low a test of probability just like the issues found deficient by the Supreme Court on inadequate hiring in its opinion.


<u>Conclusion</u>

For all of the foregoing reasons, I respectfully dissent from the analysis and conclusion of the majority opinion.  I urge Bryan County to file a motion for panel rehearing and suggestion for en banc reconsideration with respect to the majority's treatment of both the liability and damage issues so that all of the active members of our Court might have an occasion to address

the very serious issues raised by the majority's handling of this

appeal.