# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

_____

m 01-60774

_____

IN THE MATTER OF:

BOBBY RAY FOUST AND CATHY FOUST,

Debtors.

BOBBY RAY FOUST; CATHY FOUST; AND DONALD O. SIMMONS,

Appellants,

VERSUS

DAN C. MCNEILL; LAMAR THIGPEN; AND PEARL RIVER COUNTY,

Appellees.

_____

Appeal from the United States District Court
for the Southern District of Mississippi

_____

November 12, 2002

Before DAVIS, SMITH, and BENAVIDES,
    Circuit Judges.

JERRY E. SMITH, Circuit Judge:

The sheriff's office of Pearl River County, Mississippi, executed a writ of replevin by seizing Bobby and Cathy Foust's convenience store and permitting a creditor to repossess the inventory. The writ directed the officers to take only the fixtures, inventory, and equipment; state law required them to hold the personal property for two days following seizure. Disregarding both limits, the officers seized the premises and turned over the inventory immediately. The bankruptcy court held that these actions did not violate the Bankruptcy Code, the Fourteenth Amendment's Due Process Clause, the Fourth Amendment, or Mississippi's replevin statute. The district court affirmed. We affirm in part, reverse in part, and remand.

I.

On February 17, 1998, Gerald Seal and his wife, Diane Seal, filed an *ex parte* complaint for replevin in the circuit court of Pearl River County, Mississippi, alleging that Bobby Ray Foust and his wife, Cathy Foust, had executed an installment promissory note secured by inventory and certain furniture, fixtures, and equipment located in a convenience store in Mississippi. According to the complaint, the Fousts had defaulted on the note, and under its terms, the Seals were entitled to possession of the collateral.

The circuit judge ordered the clerk to issue a writ of replevin and directed the sheriff "to immediately seize and take into their possession the property described . . . and to deliver said property to the Plaintiffs unless bonded by the Defendants, and to summon the said De-fendants to appear" in the circuit court on April 6, 1998, to respond to the Seals' complaint. The clerk issued a writ that conformed to these requirements.

On February 18, Gerald Seal delivered copies of the pleadings and orders to the sheriff's office. At the time, Dan McNeill was the sheriff and employed Lamar Thigpen as a civil deputy. Thigpen served all civil process, including writs of replevin, in the south end of the county. He had been employed by the county for over eight years but had not received training in the service of civil process. Thigpen testified that he was not familiar with the specific requirements of the Mississippi replevin statute; he consulted with Seal's attorney and other members of McNeill's staff before serving the writ.

Thigpen initially served the writ on Cathy Foust and her mother, who were working at the store. Thigpen requested permission to lock the door and seize the premises, but Cathy Foust refused. She and her mother then called Bobby Foust to advise him that Thigpen was closing the store, having the locks changed, and locking the premises. Thigpen and McNeill testified that they commonly seized premises when they could not find a place to store the seized items.

Thigpen then allowed Gerald Seal to remove all the inventory and place it in storage sheds on the property of Seal and his father. The sheriff does not have a warehouse to store items seized pursuant to writs of replevin.

On February 19, the Fousts filed a voluntary petition for chapter 13 bankruptcy and served notice of the filing on McNeill. At seven o'clock that evening, Thigpen met the Fousts at the store and turned over the keys

but did not return the inventory he had given to Gerald Seal. Upon notification of the filing, Seal refused to return the inventory.

The Fousts' bankruptcy complaint alleged that McNeill, Thigpen, and the county had violated the Bankruptcy Code by failing to turn over the property promptly and provide an accounting. The Fousts also sued for damages under 42 U.S.C. § 1983, alleging that the writ of replevin violated their rights under the Fourth and Fourteenth Amendments. Finally, the Fousts claimed that McNeill and Thigpen had violated the requirements of Mississippi's replevin statute.

The bankruptcy court dismissed most of the Fousts' claims at summary judgment, holding that McNeill and Thigpen had complied with the Bankruptcy Code by turning over the keys to the premises as soon as they learned of the filing. The court held, however, that McNeill and Thigpen had a duty to provide an accounting to the estate. The court ruled that McNeill and Thigpen had quasi-judicial, absolute immunity and dismissed the federal, constitutional claims against the individual defendants in their personal capacities. The court also found that Mississippi state law immunized McNeill, Thigpen, and the county from liability for executing the judicial order. The bankruptcy court therefore granted defendants' motion for summary judgment on all claims but the accounting.

The district court affirmed for substantially the same reasons and dismissed the action. The court failed, however, explicitly to rule whether the Bankruptcy Code might require Thigpen and McNeill to provide an accounting.

II.

The Fousts agree with the conclusions of the bankruptcy and district courts that McNeill and Thigpen qualified as "custodians" under 11 U.S.C. § 101(11),[1] making the requirements of 11 U.S.C. § 543 applicable. On appeal, however, the Fousts argue that McNeill and Thigpen failed to comply with § 543's turnover and accounting requirements. The summary judgment, including the bankruptcy and district courts' interpretations of statutes, are reviewed *de novo*. *See Carney v. Internal Revenue Serv. (In re Carney)*, 258 F.3d 415, 417-18 (5th Cir. 2001) (summary judgment); *Samson v. Apollo Res., Inc.*, 242 F.3d 629, 633 (5th Cir.) (statutory interpretation), *cert. denied*, 534 U.S. 825 (2001).

A.

Section 543(b) imposes a straightforward turnover obligation: The custodian must "deliver" to the estate "any property of the debtor . . . that is in such custodian's possession, custody or control on the date that the custodian acquires knowledge of the commencement of the case." 11 U.S.C. § 543(b)-(1). The Fousts admit that Thigpen retained

---

[1] The subsection defines a custodian as

(A) receiver or trustee of any of the property of the debtor, appointed in a case or proceeding not under this title; (B) assignee under a general assignment for the benefit of the debtor's creditors; or (C) trustee, receiver, or agent under applicable law, or under a contract, that is appointed or authorized to take charge of property of the debtor for the purpose of enforcing a lien against such property, or for the purpose of general administration of such property for the benefit of the debtor's creditors.

11 U.S.C. § 101(11).

3

"possession" and "control" of the keys to the premises only after they filed bankruptcy. Thigpen turned over the keys to the Fousts on the same day that they filed for bankruptcy; he already had turned over the inventory to the Seals, so it was no longer in his possession or control.

The Fousts cite no authority, and have no colorable argument, for the proposition that Thigpen or McNeill failed to satisfy his delivery obligations. Nothing in § 543 indicates a turnover obligation for items no longer in the "possession" or "control" of a custodian at the time he acquires knowledge of a bankruptcy, regardless of whether the prior loss of "possession" or "control" was proper. We therefore affirm as to this question.

### B.

Section 543(b)(2) requires the custodian to "file an accounting of any property of the debtor . . . that, at any time, came into the possession, custody, or control of such custodian." 11 U.S.C. § 543 (b)(2). The bankruptcy court found a fact question as to whether McNeill and Thigpen had violated their duty to provide an accounting: "[T]he court concludes that as to the requirement of an accounting pursuant to Section 543(b)(2), the Movant-Defendants are not entitled judgment as a matter of law and the motion for summary judgment is denied to that extent." The district court's opinion dismisses the entire cause of action but fails to address the question.

In the appeal to this court, defendants have not directly addressed their accounting obligations, but instead have only argued, under § 543, that Thigpen lacked possession or control of the inventory when he learned of the bankruptcy filing. Section 543(b)(2)'s terms encompass all property over which a custodian previously had possession or control; that

Thigpen lacked possession or control at the time he learned of the filing, therefore, does not preclude his obligations under the statute. We accordingly reverse that portion of the district court's decision.[2]

### III.

The Fousts argue that the district court improperly dismissed the federal constitutional claims against McNeill and Thigpen in their individual capacities. The bankruptcy and district courts found that the judicial writ created absolute immunity for actions taken in accordance with its requirements and that all of Thigpen and McNeill's actions fell within its scope. The Fousts argue, to the contrary, that absolute immunity should not extend to actions taken by Thigpen and McNeill that were not explicitly required by the writ.

Absolute immunity can extend to government officials who perform quasi-judicial functions. *Thomas v. City of Dallas*, 175 F.3d 358, 362 (5th Cir. 1999). In determining whether a person is entitled to quasi-judicial immunity, courts employ a "functional approach" that focuses on "the nature of the function performed, not the identity of the actor who performed it." *Id.* (citing *Imbler v. Pachtman*, 424 U.S. 409, 431 (1976)).

Law enforcement officers have absolute im-

---

[2] The Fousts also argue that quasi-judicial immunity does not apply to the Bankruptcy Code, citing *Paren v. Noneman (In re Noneman)*, 158 B.R. 447 (N.D. Ohio Bankr. 1993), and *In re Sundance Corp.* 149 B.R. 641 (E.D. Wash. 1993). The defendants, however, have never argued that quasi-judicial immunity eliminates their responsibilities under the Bankruptcy Code, and neither the district court nor the bankruptcy court relied on such a theory.

4

munity for enforcing the terms of a court order but only qualified immunity for the manner in which they choose to enforce it. In *Mays v. Sudderth*, 97 F.3d 107, 109-10, 114 (5th Cir. 1996), the court dismissed an arrestee's § 1983 claim against a sheriff for unlawful arrest pursuant to an unconstitutional warrant. We began with the settled proposition that judges are protected by absolute immunity, *id.* at 110, then noted that in 1871, when Congress enacted § 1983, "the common law provided absolute immunity to government officials in their execution of facially valid judicial orders entered by a court of competent jurisdiction," *id.* at 112. This common law immunity made good sense: Enforcement of a court order is closely intertwined with the judicial function, court personnel should not serve as a lightening rod for harassing litigation, and an official charged with enforcing a facially valid court order has no choice. *Id.* at 112-13. We therefore held that where a sheriff executes a facially valid warrant in a constitutionally permissible manner, he should not face liability for the warrant's unlawfulness. *Id*. at 113.[3]

We also noted, however, two limitations on the scope of absolute immunity. First, if the court order is so unlawful that it falls outside the scope of judicial business and the judge himself would face liability, so will the enforcing official. *Id.* at 114. The second limitation, relevant here, is that the scope of the order

limits the scope of absolute immunity. *Id.* at 114.[4]

In *Hart v. Obrien*, 127 F.3d 424, 440 (5th Cir. 1997), *abrogated on other grounds, Kalina v. Fletcher*, 522 U.S. 118 (1997), the court enforced the limits suggested in *Mays*. The magistrate judge in *Hart* had ordered a sheriff or peace officer to carry out an unlawful search. *Id.* The assistant county attorney participated in the search, and the district court afforded him absolute immunity for complying with the court order. *Id.* at 431-33. We reversed, however, noting that the search warrant covered only sheriffs and peace officers. *Id.* at 440. The court applied the limit suggested in *Mays*SSthe judicial order must compel the officers' actions.[5]

---

[3] Other federal courts have reached the same conclusion. *E.g., Valdez v. City & County of Denver*, 878 F.2d 1285, 1289 (10th Cir. 1989) ("Officials must not be called upon to answer for the legality of decisions which they are powerless to control."); *Henry v. Farmer City State Bank*, 808 F.2d 1228, 1239-40 (7th Cir. 1986) (explaining that appeal is the sole avenue for challenging an unconstitutional court order).

[4] The court stated that "our ruling does not address the liability of an officer whose conduct in executing a facially valid order exceeds the scope of that order." This is consistent with our jurisprudence defining the scope of a court clerk's quasi-judicial immunity. *E.g., Clay v. Allen*, 242 F.3d 679, 682 (5th Cir. 2001) (stating that clerks receive absolute immunity for "acts they are specifically required to do under court order or at a judge's discretion" but only qualified immunity for "routine duties not explicitly commanded") (citations omitted); *Tarter v. Hury*, 646 F.2d 1010, 1013 (5th Cir. Unit A June 1981) (same).

[5] *Cf. Martin v. Bd. of County Comm'rs*, 909 F.2d 402, 405 (10th Cir. 1990) ("[A]bsolute immunity does not protect defendants from damage claims directed not to the conduct prescribed in the court order itself but to the manner of its execution."); *Turney v. O'Toole*, 898 F.2d 1470, 1474 (10th Cir. 1990) ("[T]his absolute immunity extended only to acts prescribed by Judge Wolking's order."); *Cortez v. Close*, 101 F. Supp.2d 1013, 1016 (N.D. Ill. 2000) (explaining that scope of order limits scope of immunity); *Sharp v. Kelsey*, 918 F. Supp. 1115, 1121 (W.D. Mich. 1996)

The writ directed Thigpen and McNeill "to immediately seize and take into their possession the property described in the Complaint . . . and to deliver said property to the Plaintiffs unless bonded by the defendants." The complaint defined the collateral as "inventory" and "certain equipment and fixtures" located in the convenience store. The Fousts argue that Thigpen and McNeill violated the terms of the order by (1) immediately turning over the property to the Seals and (2) seizing the premises.

The Fousts contend that the order did not require the officers to turn the seized property over to the Seals immediately; they point to a state law that requires the sheriff to hold the property for two days before turning it over to a plaintiff. MISS. CODE ANN. § 11-37-109 (Supp. 2001). This interpretation is correct: The order directs the sheriff immediately to seize the property and to turn it over to the Seals, but it is silent as to how long he should wait before turning it over to them.

McNeill might infer that he should turn it over immediately, but state law, not a *tabula rasa* reading of the order, should set the pre-

_____

(holding that immunity extended to act of arrest but not "manner in which they took [plaintiff] to jail").

Federal courts are more likely to disagree over the scope of a judicial order or command than over whether that command limits the scope of immunity. *Compare Martin v. Hendren*, 127 F.3d 720, 721-22 (8th Cir. 1997) (finding that police officer had absolute immunity when he used excessive force to restrain arrestee in court at the judge's direction) *with Richman v. Sheahan*, 270 F.3d 430, 437-38 (7th Cir. 2001) (holding that deputies exceeded scope of judge's order by using excessive force to restrain persons in the courtroom), *cert. denied*, 122 S. Ct. 1439 (2002).

sumption in cases of silence. The Fousts also correctly note that the order does not require the seizure of the premises. The district court should not have granted absolute immunity to Thigpen and McNeill's seizure of the premises and failure to afford the Fousts an opportunity to reclaim the property promptly.

IV.

The Fousts further argue that Thigpen's and McNeill's actions violated clearly established constitutional rights, so they are not entitled to qualified immunity. To evaluate the qualified immunity defense, we first must decide "whether plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 122 S. Ct. 2508, 2513 (2002) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Second, if the defendants engaged in "constitutionally impermissibly conduct," *id.* at 2515, we must decide whether their actions "violate[d] 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* at 2515 (quoting *Harlow v. Fitzgerald*, 557 U.S. 800, 818 (1982)).

A.

The Fousts argue that the state circuit court's grant of an *ex parte* writ of replevin violated the Fourteenth Amendment's Due Process Clause. Because "unlike some legal rules, [due process] is not a technical conception with a fixed content unrelated to time, place, and circumstances," *Connecticut v. Doehr*, 501 U.S. 1, 19 (1991) (internal quotation marks and citation omitted), we must review the cases individually to determine the procedures that are constitutionally required.

In *Fuentes v. Shevin*, 407 U.S. 67, 79-80 (1972), the Court struck down Florida and Mississippi prejudgment replevin statutes, em-

phasizing that they did not provide for pre-deprivation notice and opportunity to be heard. The Court emphasized that modern courts should preserve the hearing required at common law:

> That the hearing required by due process is subject to waiver, and is not fixed in form does not affect the root requirement that an individual be given an opportunity for a hearing before he is deprived of any significant property interest, except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.

*Id.* at 82. The Court held that the statutes' requirements that a plaintiff post a bond, conclusionally allege an entitlement to specific goods, defend his claim at a prompt post-deprivation hearing, and open himself up to damages if in error did not sufficiently protect the defendant's due process rights. *Id.* at 83-85.

In 1991, the Court invalidated a Connecticut statute that permitted a party suing for personal injuries to seek an *ex parte*, prejudgment attachment of the defendant's real estate to guarantee the judgment. *Doehr*, 501 U.S. at 5. The Court adopted a formal test for examining the provisional remedy, borrowing from *Matthews v. Eldridge*, 424 U.S. 319, 343-44 (1976):

> [T]he relevant inquiry requires, . . . first, consideration of the private interest that will be affected by the prejudgment measure; second, an examination of the risk of erroneous deprivation through the procedures under attack and the probable value of additional or alternative

safeguards; and third, . . . principal attention to the interest of the party seeking the prejudgment remedy, with, nonetheless, due regard for any ancillary interest the government may have in providing the procedure or foregoing the added burden of providing greater protections.

*Doehr*, 501 U.S. at 11.

In *United States v. James Daniel Good Real Property*, 510 U.S. 43 (1993), the Court held that the Fifth Amendment's Due Process Clause requires notice and an opportunity to be heard in civil forfeiture proceedings for real estate. The Court, employing language originally used in *Fuentes*, stated, "We tolerate some exceptions to the general rule requiring predeprivation notice and hearing, but only in 'extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.'" *Id.* at 53 (citations and quotations omitted). The Court gave formal effect to this presumption in applying the three-part *Matthews* test. *Id.*

Under the first prong, the Court emphasized that the defendant has a strong property interest in his home and the possessions it contains. *Id.* at 53-54. Under the second prong, the Court remarked that *ex parte* seizure could be predicated on a magistrate's finding of probable cause that the property was used or intended to be used in the commission of a drug offense. *Id.* at 502. The United States did not have an obligation to disprove the owner's innocence, and the owner had no right to be heard. *Id.* at 55. The Court held that a post-seizure procedure would not adequately protect the owner's property interest, *id.* at 55-56, and that the United States had a weak

7

interest in prompt seizure, "because real property cannot abscond." *Id.* at 57.

The Mississippi Supreme Court has considered the constitutionality of the replevin statute at issue in this case.[6] In *Underwood v. Foremost Fin. Servs. Corp.*, 563 So. 2d 1387, 1389 (Miss. 1990), the debtors sued creditors for seizing their home under MISS. CODE ANN. § 11-37-101 without a pre-seizure hearing. Without dwelling on the issue, the court noted that the statute "now meets minimum due process requirements." *Id.* at 1389. The court held that the circuit judge had erred by failing to hold an evidentiary hearing on the debtors' claims, because the debtors at least had pleaded a constitutionally suspect seizure. *Id.* at 1391. The Court explained that "the record evinces no explanation for the necessity of an *immediate* seizure. In cases where pre-seizure process is feasible, compliance with MISS. CODE ANN. § 11-37-131 (Supp. 1989) is required." *Id.* at 1391. The court interpreted the Mississippi statute in light of the federal constitution, because by its terms, the Mississippi replevin statute does not require a pre-seizure hearing where "feasible."[7]

Thigpen's actions in seizing the premises do not survive constitutional scrutiny under the *Matthews* test. First, the Fousts had a substantial interest in the continued occupation of their commercial premises. Second, the risk of erroneous deprivation was significant. Although the record does not include the appendices to the Seals' complaint, the complaint refers generically only to the "certain inventory," "certain fixtures," and "certain equipment." This resembles the sort of skeletal complaint that the Supreme Court repeatedly has condemned.[8] The circuit judge did not articulate

---

[6] The statute has a checkered history. In 1989, a Mississippi federal court struck down its predecessor because it required a judge to issue a writ of replevin if the party filed a declaration; the court held that a judge must have the discretion to refuse to issue the writ. *Wyatt v. Cole*, 710 F. Supp. 180, 182 (S.D. Miss. 1989), *aff'd in part and rev'd in part on other grounds*, 928 F.2d 718 (5th Cir. 1991), *rev'd on other grounds*, 504 U.S. 158 (1992). The current version of the statute became effective July 1, 1990, and it is this version that was considered by the Mississippi Supreme Court. *Underwood v. Foremost Fin. Servs. Corp.*, 563 So. 2d 1387, 1389 (Miss. 1990).

[7] MISS. CODE ANN. § 11-37-101 (Supp. 2001); MISS. CODE ANN. § 11-37-131 (Supp. 2001). The constitutionality of the amended replevin statute remains an open question in federal and state courts. As one commentator has explained:

> The Mississippi Supreme Court has stated that the statute as revised meets due process requirements. *Underwood v. Foremost Fin. Serv.*, 563 So. 2d 1387, 1389 (Miss. 1990). Nevertheless, many Mississippi attorneys think that the procedure authorized in section 11-37-101 remains unconstitutional because it allows seizure of the collateral without a hearing, and will only seek replevin under section 11- 37-131, which requires a hearing prior to the issuance of the writ.

W. Rodeny Clement, Jr., *Enforcing Security Interests in Personal Property in Mississippi*, 67 MISS. L.J. 43 n.161 (1997).

[8] *See, e.g.*, *Mitchell v. W.T. Grant*, 416 U.S. 600 (1974) (upholding Louisiana sequestration statute in part because it required plaintiff to plead specific, sworn facts demonstrating an entitlement to specific goods); *N. Ga. Finishing, Inc. v. Di-Chem, Inc.,* 419 U.S. 601 (1975) (invalidating

any standard for making his decision, and the replevin statute does not specify a standard.

Judging by this particular complaint and order, there was a high risk of erroneous deprivation. McNeill's and Thigpen's actions, by locking the Fousts out of their business, further increased the risk that they would deprive themSSalbeit temporarilySSof unencumbered property.

The cost of additional government procedures was minimal. The Mississippi Supreme Court had held that circuit courts should hold hearings where feasible, and the circuit judge in this case did not make a finding that a hearing on notice would be infeasible. On the facts of this case, locking the Fousts out of their store violated the Due Process Clause.

B.

Even if Thigpen's seizure violated due process, he will escape liability if the constitutional right was not "clearly established" in 1998. For a right to be "clearly established" in the context of qualified immunity,

> [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light

of pre-existing law the unlawfulness must be apparent.

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (citations omitted).

In *Hope*, 122 S. Ct. at 2516, the Court elaborated that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Previous cases need not be "fundamentally similar." *Id.* "The salient question" for a court of appeals is "whether the state of the law [at the time of the state action] gave respondents fair warning that their alleged treatment of [the plaintiff] was unconstitutional." *Id.*

Thigpen and McNeill did not have such "fair warning." The constitutionality of Mississippi's replevin statute remained up in the air, and the Supreme Court precedent demands a highly fact-dependent inquiry that a reasonable could find difficult to predict. Thigpen even had judicial authorization to seize certain "fixtures" in the building, and he might have concluded the only reasonable way to do so was by seizing the premises. He had no way of knowing whether the underlying replevin statute was unconstitutional, and he reasonably could rely on it to inform his opinion of whether seizing the store was lawful.[9]

Although Thigpen should have known that the Mississippi Supreme Court had held that the court should conduct a pre-seizure hearing

---

statute, emphasizing that the supporting affidavits might contain only conclusional allegations); *Doehr*, 501 U.S. at 14 (finding significant risk of erroneous depravation under a Connecticut statute because plaintiff did not need to provide detailed affidavits or factual support, only a "skeletal affidavit.").

[9] *Cf. Wyatt v. Cole*, 994 F.2d 1113, 1120 (5th Cir. 1993) ("We think that *private* defendants, at least those invoking ex parte prejudgment statutes, should not be held liable under § 1983 absent a showing of malice and evidence that they either know or should have known of the statute's constitutional infirmity.") (emphasis added).

"where feasible," the contours of feasibility had not been spelled out. A reasonable deputy or sheriff acting in 1998 would not have known that seizing the premises violated Fourteenth Amendment due process rights. Thigpen and McNeill enjoy qualified immunity for the violation of the Fousts' Fourteenth Amendment rights.

## C.

The Fousts argue that the seizure of their premises violated their Fourth Amendment rights. The Fourth and Fourteenth Amendment questions interrelate,[10] but we must consider them separately, because either, standing alone, could provide sufficient grounds for the Fousts to recover.[11]

Only the Eighth Circuit has squarely addressed the constitutionality of a prejudgment attachment or replevin under the Fourth Amendment.[12] In *Audio Odyssey,* the court held that a sheriff's deputy had unconstitutionally executed a writ of replevin by changing the locks on a commercial business, posting no trespassing signs, and barring the entry of the owner for several weeks, even though the writ only called for the seizure of personal property. Although the court determined that Iowa's replevin statute, on its face, satisfied the Fourteenth Amendment, *Audio Odyssey,* 245 F.3d at 732-33, the court held that the Fourth Amendment rendered the seizure of the building presumptively unreasonable, and the writ authorizing the seizure of inventory, equipment, and fixtures did not extend to the building itself, *id.* at 736. The court noted that the sheriff had barred others from entering the building for weeks, far longer than necessary to inventory and repossess the relevant items. *Id.* Finally, the court held that the officers did not deserve qualified immunity, because any reasonable officer would have known that the seizure of the premises violated the Fourth Amendment.

Thigpen excluded the Fousts from the premises for hours, instead of weeks as did the officer in *Audio Odyssey*. Such a short-term seizure could have been necessarily incidental to taking an inventory of the contents and repossessing the secured property. Like the writ

---

[10] In *Fuentes*, 407 U.S. at 97 n.32, the Court refused to reach the question of whether the Florida's and Pennsylvania's prejudgment replevin statutes violated the Fourth Amendment. "Once a prior hearing is required, at which the applicant for a writ must establish the probable validity of his claim for repossession, the Fourth Amendment problem may well be obviated." *Id.* In *Fuentes*, *id.* at 78-79, however, the petitioners only challenged the constitutionality of the statutes and did not request damages under § 1983. The Court did not have to consider multiple bases of recovery.

[11] *James Daniel Good*, 510 U.S. at 50 (holding that because the "seizure of property implicates two explicit textual source[s] of constitutional protection, . . . [t]he proper question is not which Amendment controls but whether either Amendment is violated.") (internal quotation marks and citation omitted).

[12] *See Audio Odyssey, Ltd. v. Brenton First Nat'l Bank*, 245 F.3d 721 (8th Cir. 2001). The court vacated *Audio Odyssey* to rehear the case en banc but reinstated the panel opinion in full. *Audio Odyssey, Ltd. v. Brenton First Nat'l Bank*, 286 F.3d 498, 500 (8th Cir. 2002) (en banc) ("The panel opinion addresses the full array of issues presented in this appeal in considerable detail. We cannot improve upon that opinion's discussion . . . ."), *cert. denied*, 2002 U.S. App. LEXIS 8038 (U.S. Oct. 21, 2002).

in *Audio Odyssey*, the writ here authorized the sheriffs to seize "fixtures." A fixture is a tenant's personal, removable property that is attached to the property. BLACK'S LAW DICTIONARY 652 (7th ed. 1999). Removing fixtures could require occupying the premises for several hours, and the sheriff should have the incidental power to exclude others to prevent a breach of the peace.

The summary judgment evidence, however, does not support interpreting the seizure of the premises as merely incidental. Thigpen told Cathy Foust and her mother that he was going to have the locksmith change the locks on the building. He also did not immediately reopen the convenience store after Seal and his co-workers had removed the encumbered property. Finally, Thigpen returned the keys only after learning that the Fousts had filed for bankruptcy. The Fousts at least have created a fact question about whether Thigpen unreasonably deprived them of their property, beyond the scope of the writ. His actions, as pleaded, violated the Fourth Amendment.

### D.

We next turn to the question of qualified immunity for Thigpen and McNeill for the Fourth Amendment claim. Until the Eighth Circuit's opinion in *Audio Odyssey*, neither the Supreme Court nor a federal court of appeals had held that a seizure under a replevin statute violates the Fourth Amendment.[13] The Eighth Circuit concluded that the sheriff's actions violated "clearly established" law, but the sheriff in that case barred the owners from the premises for weeks; his exclusion of the owners from the property drove the store out of business. *Audio Odyssey*, 245 F.3d at 727-29. Thigpen had a much more reasonable basis for his belief that occupation of the premises was constitutional. In light of the precedent discussed *supra* part IV.B., it was not "clearly established" in 1998 that Thigpen's actions violated the Fourth Amendment. The dismissal of the § 1983 claims against Thigpen and McNeill is affirmed.

### V.

The Fousts argue that the district court improperly dismissed the claims against the county and McNeill in his official capacity. In § 1983 suits against the county or governmental officials in their official capacities, such as McNeill, the courts apply neither qualified immunity nor state respondeat superior doctrines.[14] Instead, a plaintiff must demonstrate that a county "policy" was the "moving force" behind the constitutional violation. *Brown v. Bryan County, Okla.*, 219 F.3d 450, 457 (5th Cir. 2000). The Fousts argue that McNeill's practice of locking owners out of their premises when executing writs of replevin, and his failure to train his deputies on how to execute such writs, constituted "policies" that were the "moving

---

[13] A consensus of authority in other circuits may "clearly establish" a right even absent binding precedent by the Supreme Court or the Fifth Circuit. *McClendon v. City of Columbia*, 2002 U.S. App. LEXIS 18318, at 32-33 (5th Cir. Sept. 5, 2002) (en banc). Given that *Audio Odyssey* was decided after the actions taken in the present case, however, *McClendon* is not

applicable. Furthermore, *Audio Odyssey* would be insufficient to "clearly establish" the right at issue here, because it is insufficiently factually similar and represents the view of only one other circuit.

[14] In *Coon v. Ledbetter*, 780 F.2d 1158, 1161-62 (5th Cir. 1986), the court expressly rejected the notion that a Mississippi sheriff could face *respondeat superior* liability where his deputies violated § 1983.

11

forces" behind constitutional violations.

## A.

To establish liability for a policy or practice, a plaintiff must prove that (1) the local government or official promulgated a policy; (2) the decision displayed "deliberate indifference" and proved the government's culpability; and (3) the policy decision lead to the particular injury. *Bryan County*, 219 F.3d at 457. A formal policy is "[a] policy statement, ordinance, regulation or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority." *Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1984) (en banc). An informal but still official policy is "[a] persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Id.* Finally, "a final decisionmaker's adoption of a course of action 'tailored to a particular situation and not intended to control decisions in later situations' may, in some circumstances, give rise to municipal liability under § 1983." *Board of the County Comm'rs v. Brown*, 520 U.S. 397, 406 (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 481 (1986)).

The culpability element requires proof that the defendants adopted the policy with "deliberate indifference." This "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.* at 410. The causation element requires that the policy be the "moving force" behind the plaintiff's injury. "That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.* at 404.

Thigpen and McNeill testified that the sheriff's office routinely seized a debtor's entire premises to secure personal property and fixtures. Neither the bankruptcy court nor the district court mentioned this testimony, and the defendants do not address it. If the department repeatedly went beyond the scope of the writs to seize real property, its policy may have violated the Fourth and Fourteenth Amendments. The department was deliberately indifferent to those results, *i.e.*, the seizure of the real property and exceeding the scope of the writ, even if unaware of the unlawfulness of the actions. The Fousts have created a fact question about whether the department's policy of seizing the premises violated the Fourth and Fourteenth Amendments, so this portion of the district court opinion is reversed.

## B.

"The failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989). To prove that the failure to train rises to the level of a municipal policy, a plaintiff also must satisfy the culpability and causation requirements described above. *Brown*, 219 F.3d at 457. The failure must rise to the level of a deliberate or conscious choice among alternatives. *Canton*, 489 U.S. at 389.

When evaluating whether additional training is constitutionally required, it is necessary to consider whether the department has faced a history of similar problems.

*Languirand v. Hayden*, 717 F.2d 220, 227-28 (5th Cir. 1983). We also must look to the officers' overall training and must consider the need for additional training in that context. *Canton*, 489 U.S. at 390-91; *Pineda v. City of Houston*, 291 F.3d 325, 334 (5th Cir. 2002).

The Fousts presented little evidence that additional training would have helped. Thigpen admitted ignorance of the requirement that the sheriff retain the seized property for two days. McNeill provided Thigpen with books on civil process but did not send him to any formal classes.

The Fousts have not met their burden of proving deliberate indifference. McNeill reasonably could have assumed that Thigpen could learn the necessary details of civil process from the books. The Fousts have presented no evidence that Thigpen would have been less likely to violate their ambiguous Fourth and Fourteenth Amendment rights if he had received additional training in state law, which, after all, does not speak to the incidental seizure of a commercial building when executing a writ of replevin.[15] The district and bankruptcy courts properly dismissed the claim of failure to train.

## VI.

The Fousts contend that the district court incorrectly dismissed the state law claims on the basis of Mississippi statutory immunity. We therefore must consider the liability of Thigpen and McNeill in their personal capacities and the liability of the county for immediately turning the Fousts' property over to the Seals and for temporarily seizing the store when executing the writ.

### A.

In 1993, the Mississippi Tort Claims Act ("MTCA"), also known as the Mississippi Governmental Immunity Act, shifted virtually all tort liabilities from governmental employees to the state or political subdivision.[16] The employee may be sued only as an official representative of the political subdivision. MISS. CODE ANN. § 11-46-7(2). "[N]o employee shall be held personally liable for acts or omissions occurring within the course and scope of the employee's duties." *Id*. Only fraud, malice, libel, slander, defamation, and criminal offenses fall outside the "course and scope" of employment and create personal liability, *id.*, and none of these exceptions has been pleaded here. The MTCA therefore eliminates any personal liability that Thigpen or McNeill might otherwise face.

### B.

The MTCA also sets forth the scope of the sovereign immunity of the state and its

---

[15] As discussed *supra* part IV.A., the constitutionality of Mississippi's replevin statute is uncertain. It is therefore also uncertain that any books or classes on state law could have sufficed to protect the Fousts' constitutional rights.

[16] MISS CODE ANN. § 11-46-7 (Supp. 2001). Before 1993, government officials possessed "qualified public official immunity, which insulated them against tort liability for all acts or omissions in the course and scope of governmental employment, except where they committed intentional torts, substantially exceeded their discretion and authority, or performed ministerial acts." Jim Fraiser, *A Review fo the Substantive Provisions of the Mississippi Governmental Immunity Act: Employees' Individual Liability, Exemptions to Waiver of Immunity, Non-Jury Trial, and Limitations of Liability*, 68 MISS. L.J. 703, 719 (1999).

13

political subdivisions.[17] The legislature codified specific exceptions to the state's waiver of sovereign immunity for employees' acts within the course and scope of their employment. MISS. CODE ANN. § 11-46-9.

The defendants assert that three exceptions to the waiver of sovereign immunity have relevance here. First, the government remains protected for claims "arising out of" "the performance or execution of duties or activities relating to police or fire protection unless the employee acted in reckless disregard of the safety and well-being of any person not engaged in criminal activity at the time of injury." MISS. CODE ANN. § 11-46-9(1)(c). Second, the government is immune from any claim "arising out of a . . . judicial action or inaction . . . or administrative action or inaction of a legislative or judicial nature." MISS. CODE ANN. § 11-46-9(1)(a). Third, the legislature codified the traditional exception to qualified and sovereign immunity for claims "[b]ased upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the party of a governmental entity or employee therof . . ." MISS. CODE ANN. § 11-46-9(1)(d).[18]

If Thigpen's activities related to "police protection," the Fousts would have to demonstrate that he acted with "reckless disregard" to a person's "safety and well-being." MISS. CODE ANN. § 11-46-9(1)(c). No court has yet addressed whether serving civil process or seizing goods constitutes "police protection" within the meaning of § 11-46-9(1)(c).

"Waiver of a state's sovereign immunity, like waiver of any constitutional right, is strictly construed in favor of the holder of the right." *Lelsz v. Kavanagh*, 807 F.2d 1243, 1253 (5th Cir. 1987). Similarly, the MTCA's exemptions to Mississippi's waiver should be liberally construed in favor of limiting liability.[19] Mississippi courts have applied the "police protection" exception to a variety of situations[20] and have yet to determine that any

---

[17] Under the previous regime, the state and its subdivisions had sovereign immunity for governmental functions but not for proprietary acts. Fraiser, 68 MISS. L.J. at 738; *McGrath v. City of Gautier*, 794 So. 2d 983, 985-86 (Miss. 2001).

[18] A fourth exception is also potentially applicable but was not raised by the parties: The statute allows that the government remains immune from suits "[a]rising out of the detention of any goods or merchandise by any law enforcement officer, unless such detention is of a malicious or arbitrary and capricious nature." MISS. CODE ANN. § 11-46-9(1)(j).

[19] *See Ellisville State Sch. v. Merrill*, 732 So. 2d 198, 201 (Miss. 1999) ("The Legislature passed into law the MTCA in 1993 to carve out a limited waiver of immunity for the State and its political subunits."); Fraiser, 68 MISS. L.J. at 741 (discussing the decisions of the Mississippi Supreme Court interpreting the MTCA, and specifically § 11-46-9(1)(c), and concluding that it appears the court "is construing the Act's provisions liberally in favor of governmental immunity.").

[20] *See, e.g. McGrath*, 794 So. 2d at 985-87 (deciding that patrolling the streets is police protection, as is the maintenance of police vehicles); *Foster v. Noel*, 715 So. 2d 174, 178-80 (Miss. 1998) (holding that arresting and detaining criminals is police protection); *Hall v. Miss. Dep't of Pub. Safety*, No. 96-CA-00832-SCT, slip op. at 7, 708 So. 2d 564 (Miss. 1998) (table) (opining that administering a sobriety test is police protection); *Smith v. Thompson*, 1998 WL 97287, at 2-3 (N.D. Miss. 1998) (stating that aiming a weapon at and negligently detaining a person

activity of a police officer or sheriff performed in the scope of his employment falls outside the reach of the exception.[21]

Under Mississippi law, seizure of property under a writ of replevin may be executed only by "the sheriff, or other lawful officer. . ." MISS. CODE ANN. § 11-37-109. The statute presumably prefers that service be performed by sheriffs to protect the creditors' employees who are seizing the goods and to prevent a breach of the peace. This is a mandatory duty of sheriffs within the scope of their employment and, consistent with other interpretations of § 11-46-9(1)(c), falls within the scope of "police protection."[22]

The police protection exception does not apply if the "employee acted in reckless disregard of the safety and well-being of any person not engaged in criminal activity at the time of injury." MISS. CODE ANN. § 11-46-9(1)(c). "Reckless disregard," within the meaning of the subsection, "embraces willful or wanton conduct which requires knowingly and intentionally doing a thing or wrongful act." *Maye*, 758 So. 2d at 394. Even if Thigpen did ignore the replevin statute, he did not exhibit "reckless disregard" for anyone's "safety and well-being."

The § 11-46-9(1)(c) exception to Mississippi's waiver of sovereign immunity is applicable and bars the state law claims against the county and against McNeill in his official capacity.[23] The dismissal of the Fousts' state law claims is affirmed.

For the reasons we have explained, the judgment is AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings in accordance with this opinion.

---

mistakenly believed to be the real suspect constitute police protection). One court has held that the hiring and training of police relates to "police protection," *Moore v. Carroll County*, 960 F. Supp. 1084, 1088-92 (N.D. Miss. 1997), but the Fousts do not base their state law claims on failure to train.

[21] Mississippi courts have found, in some cases, that acts, though within the scope of police protection, were not protected under the other requirements of the statute. *See, e.g. City of Jackson v. Perry*, 764 So. 2d 373, 377 (Miss. 2000) (applying the police protection exception to officer who was speeding while driving to dinner, but finding liability because his actions were reckless); *Maye v. Pearl River County*, 758 So. 2d 391, 392, 395 (Miss. 1999) (stating that transporting prisoners in a car is within the scope of "official duty," but officer was reckless in backing up an incline and hitting another car when he knew he would not be able to see cars behind him).

[22] The Mississippi Supreme Court, in determining whether actions are related to "police protection," has returned to the pre-MTCA analysis, which turns on whether the actions are taken in a governmental or proprietary capacity.

---

*McGrath*, 794 So. 2d at 985-87. "[T]he maintenance of a police department is a governmental function, for which municipalities are exempt." *Id*. at 987. Under this analysis, too, Thingpen certainly performed a governmental function and would fall within the exception.

[23] Having found that the police protection waiver exception applies, we decline to address any other waiver exceptions that might be applicable.