William HOLIDAY, Plaintiff,

v.

CITY OF KALAMAZOO, Defendant.

No. 4:01–CV–161.

United States District Court,
W.D. Michigan,
Southern Division.

March 7, 2003.

---

Michael S. Bogren, Plunkett & Cooney, PC, Michael J. Miller, Office of The City Attorney, Kalamazoo, MI, for Defendant.

William F. Piper, Piper, Connelly, Willoughby & Wise, PLLC, Portage, MI, for Plaintiff.

William Holiday, Kalamazoo, MI, pro se.

### OPINION

QUIST, District Judge.

Plaintiff, William Holiday ("Holiday"), has sued Defendant, City of Kalamazoo (the "City"), pursuant to 42 U.S.C. § 1983 based on the alleged use of excessive force by Kalamazoo Department of Public Safety ("KDPS") officers during their apprehension of Holiday on January 17, 2001. Holiday claims that the City failed to train the KDPS officers concerning the proper procedure for apprehending a subject in a situation involving a police dog where the canine handler is not present, which resulted in Holiday suffering unnecessary bites from a police dog during Holiday's apprehension. Before the Court are cross-motions for summary judgment by Holiday and the City. Since Holiday has failed to demonstrate that the alleged lack of training was the result of the City's deliberate indifference, the Court will deny Holiday's motion and grant the City's motion.

**1.** An "apprehend" command orders the police dog to tackle a suspect using his mouth to grab the suspect and bring the suspect to the ground. (Hoyt Dep. at 23–25.) An "apprehension" involves the police dog biting the suspect, usually on the arms, legs, or back.

## Facts and Procedural Background

### I. KDPS' January 17, 2001, Apprehension of Holiday

On January 17, 2001, KDPS officers had several valid outstanding warrants for Holiday's arrest, including a felony domestic violence warrant. That afternoon, KDPS received a tip that Holiday was present at 620 Reed Avenue, Kalamazoo, Michigan. KDPS Officers Peter Hoyt ("Hoyt"), John Halder ("Halder"), Keith DeBlock ("DeBlock"), Dwight Stallard ("Stallard"), and Dave Hunter ("Hunter") (collectively the "Officers") responded to the tip. Hoyt, a canine specialist, was accompanied by his trained police dog, Billy.

Once the Officers arrived at 620 Reed Avenue, Hoyt entered the dwelling's foyer and announced to Holiday: "Kalamazoo Police Canine. You're under arrest. Call out now or I'll release my dog." (Hoyt Interview at 1, Pl.'s Br. Supp. Mot. Summ. J. Against Def. City Kalamazoo Ex. 10.) Hoyt caused Billy to bark several times as a warning to Holiday. Upon hearing no response, Hoyt repeated the procedure three times before releasing Billy to apprehend Holiday. (Id.)

Holiday saw the Officers and Billy through a window, which caused Holiday to panic and flee. Holiday escaped through a basement window. The Officers observed Holiday running outside. Hoyt screamed a warning to Holiday: "Stop running or I'll release the dog." (Id.) Holiday ignored the warning and continued to flee. The Officers ran after Holiday.

During the pursuit, Hoyt tripped and fell in the deep snow, losing his grip on Billy's leash. (Id.) Billy continued to pursue Holiday with the other Officers, and Hoyt gave Billy an oral command to "apprehend" Holiday.[1] (Id. at 2.) Billy nipped

(Id.) Police dogs are not, however, trained to "apprehend" passive people, (id.), but they are trained to "engage" a suspect in the event of a physical confrontation with an officer, (Wright Dep. at 20, 23). Once the police dog

at Stallard, who was chasing Holiday, until Hoyt called Billy off Stallard. (*Id.*; Stallard Interview at 1, Pl.'s Br. Supp. Mot. Summ. J. Against Def. City Kalamazoo Ex. 12.) Billy re-focused on Holiday, and Hoyt gave Billy another "apprehend" command. (Hoyt Interview at 2.) Hoyt then yelled for everyone to "stop running." (*Id.*) Holiday eventually stopped running from the Officers and put his arms in the air. Hoyt then gave Billy a "down" command, and Billy sat down approximately five feet from where Holiday was standing. (*Id.*; Hoyt Dep. at 53–56, 62–63.)

Halder, Stallard, and Hunter state that after Holiday stopped, it appeared that Holiday was looking around in a furtive manner for an escape rout. (Halder Dep. at 29, 71–72; Stallard Dep. at 66–67; Hunter Dep. 51–52.) Hoyt was still approximately twenty to thirty feet from the other Officers and Holiday at that time. (Hoyt Interview at 2.) Hunter ordered Holiday to get onto the ground.

It is at this point that the Officers' accounts slightly differ from Holiday's version of events. Holiday contends that he began to voluntarily lower himself to the ground, but he was "not fast enough" for the officers, because "at least two of them grabbed him and helped him ease himself down on his stomach." (Pl.'s Br. Supp. Mot. Summ. J. Against Def. City of Kalamazoo at 2.) Halder states that Holiday did not comply with the Officers' repeated commands to go to the ground, so Halder grabbed Holiday's arms and began to lower Holiday to the ground to handcuff him. (Halder Dep. at 27–30.) As Holiday was being lowered to the ground, Billy began biting Holiday on his rib cage and left arm. Holiday contends that he was already handcuffed at this time, while the Officers maintain that Holiday was not handcuffed. (Hoyt Interview at 3.) When Hoyt caught

up to the group, he gave Billy an "out" command, and Billy stopped biting Holiday. (Hoyt Interview at 3.) Holiday claims that Billy bit him for approximately thirty seconds before Hoyt ordered Billy to release. (Holiday Dep. at 52.) The Officers, however, state that the biting only took place for a few seconds, (Stallard Dep. at 34), and that Holiday's thirty second estimate is "way too long," (Halder Dep. at 76). Holiday sustained minor injuries, none of which required stitches.

Hoyt opined that Billy bit Holiday because Billy believed that Holiday was fighting with the Officers as Holiday was being lowered to the ground. (Hoyt Dep. at 79–80.) KDPS Sargent Pat Wright ("Wright"), who was personally involved in training Billy, came to the same opinion when Wright later reviewed the incident. (Wright Dep. at 54–55; Wright Aff. ¶ 9, Def.'s Br. Supp. City of Kalamazoo's Mot. Summ. J. Ex. A.)

## II. *KDPS Canine Program and Officer Training Procedures*

The KDPS canine program was created in 1987. (Wright Aff. ¶ 4.) From the canine program's inception until January 17, 2001, KDPS canine officers responded to over 12,700 calls for service with their police dogs and made over 1,800 arrests. (*Id.*) Based on the number of calls for service, compared with the number of dog bites during the history of the canine program during that thirteen year period, a canine bite occurred approximately one time for every 373 service calls, or 0.002% of the time. (*Id.*) Based on a study conducted by KDPS, there have been no incidents similar to Holiday's January 17, 2001, apprehension in the history of the KDPS canine program, i.e., no other cases where a canine handler fell down or was

"engages" a suspect, the police dog will not release the suspect until the police dog is

given a command from his handler. (*Id.* at 52.)

otherwise disabled or incapacitated in a canine apprehension situation and the other officers issued orders to the suspect which allegedly caused the suspect to be bit. (*Id.* ¶ 5.)

All newly hired KDPS officers attend an Advanced Police Academy ("APA") that lasts approximately four weeks. (DeBlock Dep. at 6.) During the APAs, Wright personally instructs most newly hired officers for a "four-hour block" on the use of police dogs. (Wright Dep. at 9–10.) Wright's instruction includes training officers that when the officers are in the presence of a police dog, the officers should not have the offender move. (*Id.* at 22; Wright Aff. ¶ 7.) Additionally, Wright instructs the officers that the officers should not do anything "unless it's at the command of the dog handler." (Wright Dep. at 22; Wright Aff. ¶ 7.) Prior to the January 17, 2001, incident, KDPS did not provide any training in regard to what officers were to do or not to do if the handler of the police dog becomes disabled or incapacitated during an apprehension. (Wright Aff. ¶ 8.) KDPS has since instituted such training for all officers. (*Id.*)

Hoyt has received extensive and ongoing training as a canine handler by KDPS. (Hoyt Dep. at 28–30; Wright Dep. at 51.) Three of the four other Officers involved in the January 17, 2001, incident had received training on the use of police dogs during their APAs. However, Wright did not specifically recall what training, if any, Halder, Hunter, DeBlock, or Stallard received. (Wright Dep. at 12–14.). DeBlock received training during his APA by Wright on how police dogs are used to track and locate suspects, but he did not recall training about apprehension of suspects. (DeBlock Dep. at 6–7, 10; DeBlock Training Rs., Def.'s Br. Supp. City Kalamazoo's Mot. Summ. J. Ex. C.) Stallard also stated that he received training during his APA on how police dogs are used, but said he did not receive any training about what police dogs will react to when the police dog is apprehending a suspect. (Stallard Dep. at 6–7, 67–69; Stallard Training Rs., Br. Supp. Def. City Kalamazoo's Mot. Summ. J. Ex. B.) Halder and Hunter both stated that they received some police dog training during their respective APAs, but neither recalled much of the content of the instruction. (Halder Dep. at 6, 73, 76; Halder Training Rs., Br. Supp. Def. City Kalamazoo's Mot. Summ. J. Ex. E; Hunter Dep. at 11, 52–53; Halder Training Rs., Br. Supp. Def. City Kalamazoo's Mot. Summ. J. Ex. D.) While KDPS records indicate that DeBlock, Stallard, and Hunter received police dog training at their APAs, there is no record that Halder attended the a training session during his APA. (Wright Aff. ¶ 6.) Wright surmises that Halder likely missed the training session due to scheduling problems, and Wright is unaware of any other KDPS officer who has missed the police dog training. (*Id.*)

### III. *Procedural History*

On November 1, 2000, Holiday filed a three count complaint alleging that Hoyt, Halder, DeBlock, Stallard, and Hunter used excessive force and were grossly negligent in apprehending Holiday and the City was liable for the Officers' improper training pursuant to 42 U.S.C. § 1983. The City and the individual Officers filed separate motions for summary judgment on November 8, 2002. Holiday filed his own motion for summary judgment on his claims against the City and the individual Officers on the same day. On January 30, 2002, the Court approved a stipulation by the parties dismissing all claims against the individual officers. Thus, only Holiday's claim against the City pursuant to 42 U.S.C. § 1983, and the summary judgment motions regarding that claim, remain before the Court.

## Standard of Review

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56. Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir.1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

## Discussion

There are no issues of material fact in dispute in the instant case. While there are some discrepancies in Holiday's and the Officers' accounts of what transpired during Holiday's apprehension on January 17, 2001, none of these factual discrepancies are material. For purposes of this summary judgment analysis, the Court will accept Holiday's version of events that the Officers ordered Holiday to the ground causing Holiday to be bitten unnecessarily. There is no dispute over the content of the training KDPS provided to its officers or which officers received what training. The lone question before the Court is whether KDPS' canine training program was adequate under 42 U.S.C. § 1983.

■ A municipality can be liable under 42 U.S.C. § 1983 for constitutional violations resulting from the municipality's failure to train municipal employees under certain circumstances. *City of Canton v. Harris*, 489 U.S. 378, 380, 109 S.Ct. 1197, 1200, 103 L.Ed.2d 412 (1989); *see also Berry v. City of Detroit*, 25 F.3d 1342, 1345 (6th Cir.1994); *Russo v. City of Cincinnati*, 953 F.2d 1036, 1045–46 (6th Cir.1992); *Sell v. City of Columbus*, No. 00–4467, 2002 WL 2027113, at *5–6 (6th Cir. Aug.26, 2002). However, the municipality itself must cause the constitutional violation at issue, because "*[r]espondeat superior* or vicarious liability will not attach under § 1983". *Harris*, 489 U.S. at 385, 109 S.Ct. at 1203 (citing *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 694–95, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978)). " 'It is only when the "execution of the government's policy or custom ... inflicts the injury" that the municipality may be held liable under § 1983.' " *Id.* (quoting *Springfield v. Kibbe*, 480 U.S. 257, 267, 107 S.Ct. 1114, 1119, 94 L.Ed.2d 293 (1987) (O'Connor, J., dissenting) (quoting *Monell*, 436 U.S. at 694, 98 S.Ct. at 2037–38)).

■ "[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the [city's] failure to train amounts to *deliberate indifference* to the rights of persons with whom the police come into contact." *Id.* at 388, 109 S.Ct. at 1204 (emphasis added). The *Harris* Court described "deliberate indifference" as:

in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*Id.* at 390, 109 S.Ct. at 1205 (footnote omitted). An example of "deliberate indif-

ference" is when "city policymakers *know for a moral certainty*" that the city's armed police officers are required to arrest fleeing suspects, and the city does not train its officers in the constitutional limits on the use of deadly force. *Id.* at 390 n. 10, 109 S.Ct. at 1205 n. 10 (emphasis added). Additionally, a city may be found to have been "deliberately indifferent" if the city's police officers, in exercising their discretion, "so often violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers" who refuse to correct the problem. *Id.*

The *Harris* Court also noted some important limitations on a municipality's liability. The Court stated:

> In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform. *That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city,* for the officer's shortcomings may have resulted from factors other than a faulty training program. It may be, for example, that an otherwise sound program has occasionally been negligently administered. *Neither will it suffice to prove that an injury or accident could have been avoided if an officer had better or more training, sufficient to equip him to avoid the particular injury-causing conduct.* Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations which they must deal. And plainly, adequately trained officers occasionally made mistakes; the fact that they do says little about the training program

or the legal basis for holding the city liable.

*Id.* at 390–91, 109 S.Ct. at 1206 (internal citations omitted) (emphasis added).

■ Finally, "for liability to attach … the identified deficiency in a city's training program must be closely related to the ultimate injury." *Id.* at 391, 109 S.Ct. at 1206. The plaintiff must thus show that the deficiency in the municipality's training program actually caused the police officers to act in way that violated the plaintiff's constitutional rights. *Id.* Put another way, "[w]ould the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?" *Id.*

In *Russo*, the Sixth Circuit applied *Harris* and held that a plaintiff, in order to show that a training program violates substantive due process, must establish that: (1) the training program was inadequate for the tasks that officers must perform; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was "closely related to" or "actually caused the … injury." *Russo*, 953 F.2d at 1046 (quoting *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir.1989)); *see also Berry*, 25 F.3d at 1346.

■ In the instant case, KDPS provided basic police dog training to its officers during each officer's APA. There is no dispute, however, that KDPS did not train its officers in regard to what officers were to do or were not to do if the handler of the police dog becomes disabled or incapacitated in an apprehension situation. The Court knows of no law that requires a municipality to train its officers for every possible contingency—foreseen and unforeseen, and it appears that the KDPS officers were adequately trained for ordinary uses of police dogs.[2] It is unneces-

---

**2.** Holiday cites *Brown v. Bryan County,* 219 F.3d 450, 458 (5th Cir.2000), as an example a

police department's liability for failure to train under the so called "single incident ex-

sary for the Court to determine whether an adequate training program requires training for when the dog's handler becomes disabled for one reason or another because the Court finds that the City was not deliberately indifferent.

The City's deliberate indifference can be established in one of two ways. Holiday may prove that the City acted with deliberate indifference by showing that: (1) the City's training program was obviously inadequate and those obvious inadequacies were very likely to result in constitutional violations by KDPS officers; or (2) the occurrence of multiple similar violations, such that the City was put on notice of the deficiencies in KDPS' training program and failed to correct the flaw. Holiday fails to make either of these showings.

First, if the "need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, th[en] the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Harris*, 489 U.S. at 390, 109 S.Ct. at 1205. Holiday must show that the City policymakers knew "for a moral certainty" that KDPS' training program was insufficient. *Id.* at 390 n. 10, 109 S.Ct. at 1205 n. 10. Based on the undisputed facts before the

Court, Holiday has failed to make this showing. Holiday has not provided any affidavit from an expert opining that KDPS' training program was insufficient, or any evidence that KDPS' training methods differ from those employed by other police departments. On the other hand, it is undisputed that KDPS provided basic police dog training to its officers during each officer's APA, and KDPS provided extensive and ongoing police dog training to KDPS' police dog handlers.[3] KDPS' training included instructing officers that they should defer to the more highly trained canine handlers in situations involving canine apprehensions. The deficiency in KDPS' training that Holiday alleges is a failure to specifically instruct the officers in situation where the canine handler is incapacitated and not present at the scene of a canine apprehension. While such a situation occurred in the instant case, it is nonetheless a very unlikely scenario. Under *Harris*, KDPS is only required to adequately train its officers "to respond properly to the usual and recurring situations which they must deal," not every remotely-possible situation the imagination can conjure. *Id.* at 391, 109 S.Ct. at 1206. KDPS' training program was adequate to train its officers to deal with routine apprehensions involving police

ception." In *Brown*, the officer in question received no police training whatsoever and was given "wide latitude of conduct" with little supervision or limitations. *Id.* at 458. Following *Bryan County*, the Fifth Circuit issued a series of decisions finding no liability for police departments that provided general officer training, but no training in specific limited areas of police procedure. *McClendon v. City of Columbia*, 258 F.3d 432, 442–43 (5th Cir.2001) ("[T]here is a difference between a complete failure to train, as in *Bryan*, and a failure to train in one limited area."); *see also Gabriel v. City of Plano*, 202 F.3d 741, 745 (5th Cir.2000) ("We have consistently rejected application of the single incident exception and have noted that 'proof of a single violent incident ordinarily is insufficient to

hold a municipality liable for inadequate training.'" (citations omitted)); *Cozzo v. Tangipahoa Parish Council—President Gov't*, 279 F.3d 273, 288 (5th Cir.2002) (fining no "deliberate indifference" for police department's failure to train officer in specific area). *Bryan* is factually dissimilar to the case at bar since the Officers unquestionably received *some* training. The Court thus finds *Bryan* unpersuasive in establishing the City's liability under the "single incident exception."

3. While it appears that Halder did not receive basic police dog training at his APA, this single lapse is not fatal to KDPS' overall training program. *Harris*, 489 U.S. at 390–91, 109 S.Ct. at 1206.

dogs and their handlers. Even though the adequately trained KDPS Officers may have made a mistake in apprehending Holiday, it "says little about [KDPS'] training program or the legal basis for holding the [C]ity liable." *Id.*

Second, Holiday can show the City's deliberate indifference if the KDPS' training program "*so often* violate[d] constitutional rights that the need for further training must have been plainly obvious to the city policymakers" who refused to correct the problem prior to Holiday's apprehension. *Id.* at 390 n. 10, 109 S.Ct. at 1205 n. 10 (emphasis added). Based on the undisputed facts before the Court, Holiday has failed to make this showing, because no such similar incident had previously occurred. Since the inception of KDPS' canine program until January 17, 2001, KDPS canine officers responded to over 12,700 calls for service with their police dogs and made over 1,800 arrests. Dog bites occurred in only 0.002% of the service calls, and there is no evidence that incidents similar to Holiday's January 17, 2001, apprehension have ever occurred in the history of the KDPS canine program.

The Court thus finds that Holiday has failed to show that the inadequacy in KDPS' canine training program was the result of the City's deliberate indifference. Accordingly, the Court's analysis need not go any further. Since there are no issues of material fact in dispute, the Court will grant summary judgment in favor of the City.

### Conclusion

For the foregoing reasons, the City of Kalamazoo's Motion for Summary Judgment will be granted and Holiday's Motion for Summary Judgment Against the City of Kalamazoo will be denied.

An Order consistent with this Opinion will be entered.